COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| PATRICIA WORKMAN, | § | No. 08-07-00299-CR |
| Appellant, | § | Appeal from |
| v. | § | 168th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC # 20060D03130) |
| | § | |

**O P I N I O N**

Patricia Workman was indicted on two counts of injury to a child and convicted of one count. She was sentenced to twenty-eight years' confinement in the Institutional Division of the Texas Department of Criminal Justice. For the reasons that follow, we affirm.

**FACTUAL BACKGROUND**

At approximately 12 a.m. on January 9, 2005, Appellant took her daughter, Erika Estrada, to the emergency room at Thomason Memorial Hospital. Erika was having a seizure and was immediately brought in for examination and treatment. Dr. Patty Crocker examined the child and observed tonic-clonic movement, a jerky muscular movement typically associated with seizures. Her eyes were also rolled back in her head. The seizure stopped shortly after she was given treatment.

According to Dr. Crocker, Appellant appeared to be upset and crying when she arrived. Appellant complained that Erika had a fever and had been vomiting all day and the seizures started that evening. After the seizure was treated and the situation was calmer, Dr. Crocker believed Appellant was not forthcoming with, and did not volunteer, information about her child. Dr. Crocker

found this behavior to be unusual. Typically, mothers tend to want to give as much information as possible, down to how many diaper changes and bottles they've had.

Dr. Crocker performed further examinations and found Erika covered in bruises of various stages of healing. This suggests that the bruises were inflicted at different times. Erika was also a very small child and underweight. Dr. Crocker thought her to be in the four to six month age range and was surprised when she realized the child was already a year old. Dr. Crocker also noticed that Erika was not interactive. She demonstrated a flat affect in which she stayed still, did not smile, coo, babble, or move around at all. In Dr. Crocker's experience, this is very unusual for a one year old. Dr. Crocker suspected more serious issues than just an acute episode of a seizure, fever, and vomiting.

Dr. Crocker ordered a chest X-ray to locate the source of the fever and then later ordered a CAT scan of the head. After reviewing the X-rays a second time, Dr. Crocker noticed Erika's left arm was fractured. The fracture was in the process of healing, indicating the arm was broken more than a couple of weeks earlier. Erika was unable to use or move the arm. Crocker opined that the arm was broken by somebody grabbing it with considerable force and snapping it. Erika also had fractured ribs and bilateral hip dislocations. The CAT scan showed bleeds in the brain. Using an ophthalmoscope, Dr. Crocker could see retinal hemorrhages in the back of Erika's eyes. According to Dr. Crocker, retinal hemorrhages are very rare in babies. She concluded that Erika was an abused child and contacted the hospital's pediatric department to treat her.

Dr. Brett Henderson, a neurosurgeon, was consulted on Erika's treatment. Dr. Henderson described retinal hemorrhages, which can be caused by a violent shaking of the baby. Erika suffered from subdural hematomas, which resulted in a build-up of fluid and pressure in the brain. Erika also suffered from brain atrophy, or shrinkage, which is a loss of brain tissue due to trauma from an

earlier injury. She ad suffered at least two brain injuries. In Dr. Henderson's opinion, these were acceleration-deceleration injuries caused by the brain moving back and forth inside the skull and hitting the inside of the skull. Specifically, he opined that Erika's injuries were the result of violent shaking, consistent with somebody grabbing her from the back and violently shaking her back and forth. Dr. Henderson believed these injuries were the result of child abuse.

Child Protective Services investigator Jose Martin del Campo was already present at the hospital on another case when doctors informed him of Erika's situation. Del Campo observed the multiple injuries on Erika's body and suspected she was the victim of child abuse. Del Campo then flagged down police officers who were at the hospital and reported his suspicions. El Paso Police Officers Jorge Garcia and Wade White examined Erika after speaking with del Campo and Dr. Crocker. Garcia and White observed that Erika was unconscious, twitching slightly, and had fingerprint bruises on her torso from where someone had possibly squeezed or shaken her. Appellant was in the room with the officers, but she would not make eye contact with them. When the officers questioned her, she told them she believed the markings on Erika's torso were a rash. She did not know about the broken arm, but if there were an injury, her four-year-old son had probably caused it. Appellant also advised the officers that she had not seen the father of the children in two months, that she lived alone with her three children, and that she did not have a boyfriend at the time. The officers did not believe Appellant's story matched Erika's injuries and suspected that Erika was the victim of abuse. They referred the case to the Crimes Against Children (CAC) unit of the police department.

CAC Detective Link Brown and his partner Detective Morales responded to the hospital and met with Officer White, Investigator del Campo and the attending physicians. The doctors pointed out the various visible injuries on Erika's body to Detective Brown. Detective Brown then met with

Appellant and asked her to accompany him to the Child Advocacy Center. Appellant agreed to go and give a written statement. In that statement, Appellant explained that she had been raising her three children by herself for three years and that Erika was difficult to care for. About two months prior to this incident, Erika started waking up in the middle of the night and would not stop crying. Appellant could not get any sleep and became very upset and frustrated. Finally, about one month earlier, Appellant "just exploded" and grabbed Erika and "shook her real hard for about five seconds and then threw her back on the bed from about two feet." Appellant then described a second incident, approximately two weeks prior where she became upset and grabbed Erika real hard by her left arm to pick her up. Appellant said that she knew now that she must have broken Erika's arm during this incident.

Appellant then went on to describe the events that lead to the trip to the hospital. Erika was vomiting and Appellant thought she might be choking. Erika's arm and head went limp and Appellant then picked her up with her hands under her arms and started to shake her real hard to try and get her to react. She did not do this out of anger, but was trying to wake Erika up. Appellant then called a friend, Melissa Martinez, who drove Appellant and Erika to the hospital. En route, Erika began having a seizure. Appellant concluded her statement by admitting that she knew Erika's injuries were a result of her grabbing Erika and shaking her, but she did it out of frustration rather than anger. Appellant would explode or lose her temper out of frustration, but she "never intended for it to go this far."

After taking Appellant's statement, the Detective Brown examined Appellant's other children, two-year-old Derrik and four-year-old Erik. Detective Brown did not see any signs of abuse or injury on either child. Detective Brown then received permission from Appellant to search her apartment. Appellant accompanied Detective Brown during the search. The detective

questioned Appellant regarding folded male clothing he noticed in the apartment. Appellant then admitted that a man named Alfonso Sanchez had been "staying" with her for at least the past two weeks. Appellant later told Detective Brown that Sanchez was her boyfriend and had been living in her house for approximately eight months. Detective Brown did not consider Sanchez to be a suspect since Appellant had already confessed to injuring Erika and little Erik had told investigator del Campo that he wasn't afraid of Sanchez. Detective Brown obtained an arrest warrant for Appellant.

The defense theory at trial pointed to Alfonso Sanchez as the person who shook Erika and caused her injuries. Appellant introduced testimony from her father, Jesse Workman, her mother, Manuela Workman, and investigator del Campo. She also testified on her own behalf and repudiated most of her written statement. She specifically denied shaking Erika or any of her children. The jury found Appellant guilty of causing serious bodily injury to a Erika by grabbing or shaking her about the body, but found her not guilty of causing serious bodily injury by grabbing her arm. This appeal follows.

## EVIDENTIARY ERROR

In Point of Error One, Appellant complains of the trial court's refusal to allow defense witnesses to describe Sanchez's violent history and his behavior toward Appellant's children. She claims that this evidence was relevant and the trial court deprived her of the opportunity to present a defense.

### Standard of Review

A trial court's ruling on the admission or exclusion of evidence is reviewed under an abuse of discretion standard. *Oprean v. State*, 201 S.W.3d 724, 726 (Tex.Crim.App. 2006); *Burden v. State*, 55 S.W.3d 608, 615 (Tex.Crim.App. 2001). An abuse of discretion exists when the trial

court's decision is so clearly wrong that it lies outside the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990); *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex.Crim.App. 2003). The trial court abuses its discretion if its decision or action is arbitrary, unreasonable, and made without reference to any guiding rules or principles. *Montgomery*, 810 S.W.2d at 380.

### *The Witnesses' Testimony*

Prior to the start of evidence, the prosecutor urged a motion *in limine* requesting that the defense approach the bench before eliciting testimony regarding any alternative suspects. The trial court granted the motion.

Jesse Workman testified that he lived with Appellant during 2002, 2003, and 2004. While Appellant was working, he took care of the three children, all of whom were healthy. Appellant quit her job when Sanchez moved in approximately one year before this incident. Jesse moved out and Appellant stayed at home to care for the children. He continued to visit three to four times a week in the months leading up to this incident and he noticed that the children did not seem as active as before. They "looked kind of sad, kind of scared, sad." Erika was usually asleep. In the weeks just before the incident, Jesse noticed that Erika had a fever and told Appellant to take her to the doctor. Jesse also noticed that Appellant had lost weight, looked depressed, and appeared to have been crying each time he visited.

On voir dire examination out of the presence of the jury, Jesse testified that on one occasion, he walked into Appellant's house and witnessed Sanchez holding two-year-old Derrik by his ankles and spinning him around. Jesse told Sanchez to put him down. Sanchez responded that he was just playing, but Derrik was terrified. Derrik ran to Jesse, crying and trembling. The State objected that the testimony was irrelevant and that it was inadmissible character-conformity evidence. The court

sustained the objection.

The defense then informed the court that it wanted to elicit testimony from Manuela regarding Sanchez's alleged abuse of Appellant. The State once again objected that this was improper character-conformity evidence. On voir dire examination out of the jury's presence, Manuela noted changes in Appellant's physical appearance. She had bruises on two separate occasions. Manuela asked Appellant whether Sanchez was hitting her but Appellant denied it. She did ask Manuela to look at her nose, and Manuela thought it looked a little different. Appellant also began to shy away from her family. The State once again objected. The court sustained the objection and excluded this testimony, but allowed Manuela to testify that Appellant never physically disciplined her children and was a peaceful person.

When Appellant took the stand, she explained that she initially lied to Detective Brown about living alone with her children because she knew Sanchez had Derrik and she was afraid Derrik might be in danger. She was home that night with her three children, Sanchez, Sanchez's sister Melissa, Melissa's boyfriend, and one of Sanchez's nephews. Erika was asleep in her bedroom upstairs, and everyone else was downstairs. Sanchez went upstairs, and Appellant heard a stomp on the floor. She thought Erika had fallen out of bed, and when she ran upstairs she saw Sanchez coming out of Erika's bedroom. Appellant checked on Erika, but the child was not reacting. Appellant shook Erika to get a reaction, but not in such a way that would hurt her. Erika still did not react. Appellant called to Sanchez to see if he knew what was wrong, but Sanchez would not come back upstairs. Appellant then took Erika to the hospital.

Appellant claimed she had first noticed that Erika was not quite right a few months before this incident, but she had not seen anything to make her believe that Erika was severely injured. She categorically denied ever shaking Erika violently. She also claimed that she did not know how

Erika's arm was broken and repudiated the statement in her written confession. When asked if she knew who injured Erika, Appellant responded that she guessed it was Sanchez, because he was the only one who could have done it. She had become suspicious of Sanchez and confronted him about her suspicions because Derrik was afraid of him. Sanchez never admitted anything, and she never told anyone else about her suspicions because she was afraid of him. When asked why she was afraid, Appellant responded that he would hit her three or four times a week. The defense attempted to introduce two photographs of Appellant, one of them revealing a broken nose. The defense wanted to ask who broke her nose, but the court ruled that the evidence was irrelevant as to who hurt the child. Defense counsel then suggested that Appellant would testify she believed Sanchez hurt Erika. When the trial court indicated there had to be some basis for that belief, counsel withdrew the photographs.

During Investigator del Campo's testimony, the defense began to question him about Appellant changing her story from admitting causing Erika's injuries to blaming Sanchez. The State objected based on relevancy and hearsay grounds. On voir dire examination out of the jury's presence, del Campo testified that during his follow-up investigation, Appellant told him that she was innocent, but was afraid to say anything to the police about Sanchez. Del Campo was suspicious of Sanchez and researched the man's criminal history. The court sustained the State's objection. On voir dire examination out of the jury's presence, del Campo identified his CPS report where he noted there was reason to believe Sanchez might have abused the children. This was based upon Appellant's statement that Sanchez lived in the house; he had been violent towards Appellant in the past; his criminal record included violent behavior; and del Campo's belief that Sanchez saw Erika's injuries but failed to report it to authorities. The State objected and the court disallowed the testimony.

*Alternative Perpetrator*

A defendant must have an opportunity to put on a meaningful defense. *Gilmore v. Taylor*, 508 U.S. 333, 343, 113 S.Ct. 2112, 2118, 124 L.Ed.2d 306 (1993). Persons accused of crimes are guaranteed a meaningful opportunity to present a complete defense by the Sixth and Fourteenth Amendments to the United States Constitution. *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). The right to present a defense includes the right to attempt to establish innocence by showing that someone else committed the crime. *See Wiley v. State*, 74 S.W.3d 399, 405-06 (Tex.Crim.App. 2002), *cert. denied*, 537 U.S 949, 123 S.Ct. 415, 154 L.Ed.2d 294 (2002). Alternative perpetrator evidence may be admitted to establish a defendant's innocence by showing that someone else committed the crime. *Wiley*, 74 S.W.3d at 406. But the defendant still must show that this proffered evidence is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the alleged "alternative perpetrator." *Id.* Although it is unclear exactly how much evidence is necessary to sufficiently prove a nexus between the offense and allegedly guilty third party, Texas jurisprudence is clear that evidence of third party guilt is inadmissible if it is mere speculation that another person may have committed the offense. *Id*. at 406-08. Such speculative blaming intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on emotion or prejudice. *Id.*

Under the Texas Rules of Evidence, the trial court follows a two-step process in determining whether evidence is admissible. *See Montgomery*, 810 S.W.2d at 375-76. First, the trial court must decide whether the evidence is relevant. *Id.* at 375. Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R.EVID. 401.

Second, the trial court must determine if the evidence should be excluded because of some other provision, whether constitutional, statutory, or evidentiary. *See Montgomery*, 810 S.W.2d at 376, *citing* TEX.R.EVID. 402). A defendant's right to present relevant evidence is not unlimited, but rather subject to reasonable restrictions. *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 1264, 140 L.Ed.2d 413 (1998). Under Rule 403 of the Texas Rules of Evidence, relevant evidence may be excluded if its probative value is substantially outweighed by a number of counter-factors, including the danger of confusion of the issues. TEX.R.EVID. 403. For relevant evidence to be excluded under Rule 403, the opponent must show that its negative attributes substantially outweigh any probative value. *Montgomery*, 810 S.W.2d at 377. Rule 403 favors admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Gallo v. State*, 239 S.W.3d 757, 762 (Tex.Crim.App. 2007). Under Texas Rules of Evidence Rule 404(a) and 404(b) relevant evidence may also be excluded. Rule 404(a) provides that evidence of a person's character or a character trait is not admissible for the purpose of proving action in conformity therewith on a particular occasion. Rule 404(b) states that evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX.R.EVID. 404.

In *Wiley v. State*, the defendant argued the that the trial court denied him his constitutional right to present a defense when it excluded portions of his sworn statement to an insurance investigator and testimony by a witness that a different person might have had some involvement in committing the arson for which he was convicted. 74 S.W.3d at 401. He argued that he should have been allowed to present evidence that a known fire-starter was thrown out of the restaurant a

few days prior to the fire and was standing across the street as the restaurant burned. *Id*. at 405. Essentially, Wiley attempted to present an "alternate perpetrator" theory. *Id*. at 406. But the court found that he did not meet his burden of showing a nexus between the crime charged and the alleged alternative perpetrator. *Id*. at 406. The court found the evidence both "meager and speculative." *Id*. Even assuming that the evidence had some marginal relevance, it could not survive the balancing test under Rule 403. *Id*. at 407. Because the evidence was highly speculative, the probative value was slight. *Id*. Instead, the evidence created a threat of "confusion of the issues," and "unfair prejudice." *Id*. The court found that the trial judge did not abuse its discretion in excluding the alternative perpetrator testimony under Rule 403. *Id*. at 408.

We have recently addressed this issue in *Contreras v. State*, No. 08-06-00205-CR, 2009 WL 50601, at 7 (Tex.App.--El Paso, Jan. 8, 2009, pet. granted)(not designated for publication). There, the defendant was charged with killing a child while babysitting. He attempted to present evidence of the child's mother's alleged violent conduct to support his defensive theory that the mother actually killed the child. *Contreras*, 2009 WL 50601, at 5-8. We held that although the evidence may have shown that the mother verbally and physically abused her children in the past, it provided no evidence on its own or in combination with other evidence connecting the mother to the killing of the child. *Id.* at 8. Because the defendant failed to establish the required nexus between the mother's alleged prior violence and the killing of the child, the excluded evidence was neither relevant nor admissible to support the alternative-perpetrator defense. *Id.*

*Analysis*

We find no abuse of discretion in the exclusion of this testimony. The trial court may well have determined that the testimony was inadmissible under either Rule 404(b) or Rule 403. Even if it were relevant to show Sanchez abused Appellant, the evidence cannot be used to infer that

Sanchez abused Erika in this particular instance. The testimony was not sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and Sanchez. *See Wiley*, 74 S.W.3d at 406. Without the required nexus, the evidence did not support Appellant's alternative perpetrator defense. It amounted only to improper character conformity evidence, inadmissible under Rule 404(b). *See* TEX.R.EVID. 404(b).

The trial court could have also found the evidence to be inadmissible under Rule 403. Since there was no direct evidence that Sanchez ever abused Erika or caused Erika's injuries in this case, the testimony concerning his involvement was highly speculative. The testimony merely invited the jury to speculate that Sanchez might have committed the offense, and such invited speculation "intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on emotion or prejudice," rather than on hard evidence. *See Wiley*, 74 S.W.3d at 407. In this instance, the trial court could have found that the probative value of the evidence was minimal and outweighed by the possible prejudicial effect of the evidence. *See* TEX.R.EVID. 403. We overrule Point of Error One.

## LESSER INCLUDED OFFENSE

In Point of Error Two, Appellant argues that the trial court erred when it refused to charge the jury on the culpable mental state of recklessness.

### *Standard of Review*

A trial court's decision to submit or deny an instruction on a lesser-included offense is reviewed for an abuse of discretion. *Threadgill v. State*, 146 S.W.3d 654, 666 (Tex.Crim.App. 2004). A two-pronged test, often referred to as the *Aguilar/Rousseau* test, has been implemented to determine whether a charge on a lesser-included offense should be given. *McKinney v. State*, 207 S.W.3d 366, 370 (Tex.Crim.App. 2006); *Mathis v. State*, 67 S.W.3d 918, 925 (Tex.Crim.App. 2002),

*Hall v. State*, 158 S.W.3d 470, 473 (Tex.Crim.App. 2005). The first step is to determine whether the offense is a lesser-included offense of the offense charged. *Id.* The second prong then requires an evaluation to determine whether some evidence exists that would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser offense. *Mathis*, 67 S.W.3d at 925. In other words, the evidence must establish the lesser-included offense as a valid, rational alternative to the charged offense. *Wesbrook v. State*, 29 S.W.3d 103, 113 (Tex.Crim.App. 2000). If facts are elicited during trial that raise an issue of the lesser-included offense, and the charge is properly requested, then a charge must be given. *Ross v. State*, 861 S.W.2d 870, 877 (Tex.Crim.App. 1993)(op. on reh'g.).

*Applicable Facts*

Appellant was charged with injury to a child by intentionally or knowingly causing serious bodily injury to Erika by grabbing or shaking her. At the close of evidence, Appellant requested a charge on the lesser-included offense of injury to a child by recklessly causing serious bodily injury. Defense counsel argued that the lesser-included offense was raised by Appellant's written statement. In her statement, Appellant described two specific instances where she shook Erika:

> I am a single mother of three children and I have been raising my kids by myself for about three years. The father of my children has not helped me since we separated and he rarely visits them. Lately my daughter has been very difficult to take care of as she is always crying.
>
> At the same time I've been getting a lot of problems from my family. My father and mother are separated and my father, Jesse Workman, Jr., will come to my apartment and tell me things about my younger brother using drugs. I feel that my dad is in some way blaming me. I am by myself with my kids and have nothing to do with these problems, but I become upset and frustrated. When I get like this and my daughter is hard to take care of, I become angry out of frustration.
>
> Erika had always been good about sleeping the entire nights, and about two months ago she started waking up in the middle of the night. I would have to get up with her because she would start crying and wouldn't stop. I would never get any sleep

myself.  When the morning came and Erika would finally sleep, my other kids would be up by then and I would want to go to sleep but couldn't, because I would have to take care of them.

About a month ago in the evening, maybe 5:00 or 6:00 p.m., I just exploded.  Erika was in my bed and she just wouldn't stop crying.  I picked her up with both my hands under her arms and shook her real hard for about five seconds and then threw her back on the bed from about two feet.  When I get upset like that, I ignore her for awhile and just start crying.  I will then pick her up and take care of her after about 10 minutes when I calm down.

* * * * *

Yesterday, Saturday, at about 7:00 p.m., Erika threw up and she acted as if she was going to throw up again because saliva was coming out of her mouth.  I had her laying on top of my legs as I was sitting down and started pressing on her stomach with my fingers and hands. I thought she might be choking and I wanted her to throw up again.  After this, her arms and head went limp and I picked her up with my hands under her arms and started to shake her real hard to try and get her to react.  I wasn't shaking her out of anger, but I wanted her to react and wake up.  I shook her for about five seconds and her eyes then rolled back into her head.  I tried putting my fingers in her mouth because I thought she was still choking.

* * * * *

I know that Erika's injuries are a result of me grabbing her and shaking her, but I didn't do this out of anger.  I did this out of frustration when she wouldn't stop crying, wouldn't go to sleep, and I couldn't get any sleep because I had other kids to take care of.  I was also very frustrated because of other family problems.  My dad was always coming over and asking me why my mom left him, and now my brothers didn't call him any more or have anything to do with him.  Everything got to be too much for me.  I couldn't handle it.  I would explode or lose my temper when I took care of Erika and my other kids.

This is all that I can remember about what happened to Erika, and nothing like this had ever happened to my other kids.  I am very sorry about what has happened, and I never intended for it to go this far.  When I would get like this I would leave Erika on the bed for a while and ignore her to try and calm down.  After a while I would grab her, hold her, and just start crying out of frustration.

*Culpable Mental State*

Section 6.03 of the Penal Code defines the culpable mental state of *intentionally* as follows:

A person acts intentionally, or with intent, with respect to the nature of his conduct

or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

*Knowingly* is defined as follows:

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

*Recklessly* is defined as follows:

A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

TEX. PENAL CODE ANN. § 6.03(a)-(c)(Vernon 2003). "[A]t the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct [.]" *Williams v. State*, 235 S.W.3d 742, 751 (Tex.Crim.App. 2007), *quoting Lewis v. State*, 529 S.W.2d 550, 553 (Tex.Crim.App. 1975). "Recklessness requires the defendant to actually foresee the risk involved and to consciously decide to ignore it." *Id.* Mere lack of foresight, stupidity, irresponsibility, thoughtlessness, or ordinary carelessness, regardless of the severity of the consequences, do not suffice to constitute recklessness. *See Williams*, 235 S.W.3d at 751. Recklessness requires the defendant to actually foresee the risk involved and to consciously decide to ignore it. *Id.* Such a "devil may care" or "not giving a damn" attitude toward the risk distinguishes the culpable mental state of criminal recklessness from that of criminal negligence, which assesses blame for the failure to foresee the risk that an objectively reasonable person would have foreseen. *Id.* at 751-52. "Those who are subjectively aware of a significant danger to life and choose, without justification, to engage in actions (or in some cases inactions) that threaten to bring about that danger have made a calculated decision to gamble with

other people's lives." *Id.* at 752, *quoting* James Gobert, *Searching for Coherence in the Law of Involuntary Manslaughter: The English Experience*, 6 Crim.L.F. 435, 454 (1995). This combination of an awareness of the magnitude of the risk and the conscious disregard for consequences is crucial. *Williams*, 235 S.W.3d at 752-53. "It is callous disregard of risk, and not awareness *vel non* of risk, however, which is critical." *Id.* at 753, *quoting* Gobert, *supra* note 23 at 461. And, of course, determining whether an act or omission involves a substantial and unjustifiable risk requires an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight. *Williams*, 235 S.W.3d at 753.

Culpable mental state is generally proven by circumstantial evidence. *Lopez v. State*, 630 S.W.2d 936, 942 (Tex.Crim.App. 1982); *Dillon v. State*, 574 S.W.2d 92, 94 (Tex.Crim.App. 1978); *Bowden v. State*, 166 S.W.3d 466, 476 (Tex.App.--Fort Worth 2005, pet. ref'd). To determine culpability for an offense, a jury is entitled to consider events before, during, and after the commission of the offense. *Mouton v. State*, 923 S.W.2d 219, 223 (Tex.App.--Houston [14th Dist.] 1996, no pet.). Culpability may be inferred from the acts, words, and conduct of the accused, including inconsistent statements made by the accused, the extent of the injury to the victim, and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex.Crim.App. 1995); *Kelley v. State*, 187 S.W.3d 761, 763 (Tex.App.--Houston [14th Dist.] 2006, pet. ref'd); *Bowden*, 166 S.W.3d at 476 (holding that jury entitled to consider inconsistent statements as proof of guilt in prosecution for reckless injury to a child). In determining recklessness, "whether one is aware of a requisite risk or simply should be aware of it, is a conclusion to be drawn through inference from all the circumstances by the trier of fact." *Dillon*, 574 S.W.2d at 94.

*Analysis*

The Penal Code provides that a person commits the offense of injury to a child by

"intentionally, knowingly, recklessly, or with criminal negligence . . . caus[ing] a child . . . (1) serious bodily injury." TEX.PENAL CODE ANN. § 22.04(a)(Vernon 2003). Section 22.04(e) provides that an offense under subsection (a)(1) "is a felony of the first degree when the conduct is committed intentionally or knowingly," but it is a felony of the second degree "[w]hen the conduct is engaged in recklessly." *Id.* § 22.04(e).

Here, the facts required to prove the lesser offense are the same as or less than those required to prove the offense charged in the indictment; the offenses differ by statute only in their differing mental states. *See Gay v. State*, 235 S.W.3d 829, 832 (Tex.App.--Fort Worth 2007, pet. ref'd); *Moore v. State*, 154 S.W.3d 703, 711 (Tex.App.--Fort Worth 2004, pet. ref'd)(holding that because the offense of serious bodily injury encompasses all culpable mental states, criminally negligent infliction of serious bodily injury is a lesser included offense of knowing infliction of serious bodily injury). Thus, recklessly causing serious bodily injury to a child is a lesser included offense of intentionally or knowingly causing serious bodily injury to a child. *See* TEX.CODE CRIM.PROC.ANN. art. 37.09(3)(Vernon 2006)(an offense is a lesser-included offense of a charged offense if it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission).

Turning to the second prong of the analysis, we must determine whether some evidence exists in the record that would establish the lesser-included offense as a valid, rational alternative to the charged offense. We conclude that Appellant's statements that she shook Erika out of frustration and not out of anger and that she "never intended for it to go this far" do not raise the culpable mental state of recklessness because they do not show that she was actually aware at the time she engaged in the conduct that shaking the child could cause serious bodily injury or that she consciously disregarded that risk. Likewise, her statement that she shook Erika to revive her does

not suggest that she was aware of, contemplated, and consciously disregarded the risk that her conduct could cause serious bodily injury to the child. Because we find that nothing in the record raised an issue as to recklessness, the trial court did not abuse its discretion. We overrule Point of Error Two.

## PROSECUTORIAL MISCONDUCT

In Point of Error Three, Appellant complains that the trial court erred when it failed to declare a mistrial after the prosecutor cursed her in front of the jury at the conclusion of his argument.

### *Applicable Facts*

The State concluded its closing argument during the guilt/innocence stage by stating, "I hope you find her guilty. I hope she rots in hell. Thank you." Defense counsel objected to this line. The trial court implicitly sustained the objection and told the jury to disregard the remark. The jury then retired to the jury room for deliberations. Appellant did not request a mistrial.

To preserve error involving prosecutorial misconduct, the defendant must (1) make a timely and specific objection; (2) request an instruction that the jury disregard the matter improperly placed before the jury; and (3) move for a mistrial. *Cook v. State*, 858 S.W.2d 467, 473 (Tex.Crim.App. 1993). *Salcido v. State*, No. 08-04-00346-CR, 2006 WL 1132865 (Tex.App.--El Paso, Apr. 27, 2006, no pet.)(not designated for publication). However, this sequence is not essential to preserve complaints for appellate review. *Young v. State*, 137 S.W.3d 65, 69 (Tex.Crim.App. 2004), *citing Fuller v. State*, 827 S.W.2d 919, 926 (Tex.Crim.App. 1992). The essential requirement is a timely, specific request that the trial court refuses. *Young*, 137 S.W.3d at 69, *citing* TEX.R.APP.P. 33.1(a).

The State argues that because Appellant never requested a mistrial and received from the trial court all of the relief she requested, namely, an implicit sustaining of her objection to the complained

of jury argument and an express instruction for the jury to disregard the comment, she failed to pursue her objection to an adverse ruling. As such, the State argues that Appellant forfeited her right to complain about the comment on appeal. We agree. We overrule Point of Error Three and affirm the judgment of the trial court.

January 13, 2010

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, J., and Gomez, Judge
Gomez, Judge, sitting by assignment

(Do Not Publish)