

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-11-00168-CR
## NO. 02-11-00169-CR
## NO. 02-11-00170-CR

DUKE WATROUS                                                          APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

## FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

In four related issues, Appellant Duke Watrous appeals the punishments assessed after he pleaded guilty to manslaughter, endangering a child, and tampering with physical evidence. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

---

[1]See Tex. R. App. P. 47.4.

On Christmas Eve 2009, Watrous was at home with three of his five children: ten-year-old Ashley, nine-year-old Wesley, and one-year-old Amber. Watrous, who had been drinking alcohol, got a shotgun and began teaching Wesley and Ashley how to defend themselves and disarm a "bad guy." Watrous pointed the shotgun at Ashley, ran it along the side of her head, and poked her chest with it. He also pulled a handgun from the back of his waistband. The handgun was loaded and when he attempted to unload it, the gun fired, shooting Ashley in the face. Watrous picked up Ashley and put her on a table. He said he was cleaning his guns and told Wesley to call 911. Watrous gathered his guns and locked them in a safe in his bedroom closet. Ashley died.

At the trial on punishment, the State introduced into evidence a DVD recording of the events that occurred on Christmas Eve 2009 taken from a security camera in Watrous's home, the 911 call made by Wesley, photos of the crime scene, and the autopsy report. The State also presented as witnesses the police officers and EMT personnel who had responded to the scene; Texas Ranger Tracey Murphree, who had conducted the investigation; Brandy Washburn, who is the mother of Ashley, Wesley, and Amber; and Aude Freeman, who is Watrous's ex-wife and the mother of his other two children, Durendal and Emilie.

Defense counsel presented as witnesses Watrous himself; four of his brothers; a neighbor; an employee of Watrous's; a deputy sheriff who had supervised visits between Watrous and his children as a result of a custody

2

dispute between Watrous and Freeman prior to Ashley's death; a psychologist and a social worker who had both conducted court-ordered social investigations as part of the custody dispute; a psychologist who had conducted an evaluation of Watrous after Ashley's death; and Dr. Michelle Greer, a licensed professional counselor who had counseled Watrous, Washburn, and Wesley after Ashley's death.

The jury assessed Watrous's punishment at twelve years' confinement for the manslaughter conviction, at two years' confinement for the endangering a child conviction, and at five years' confinement for the tampering with physical evidence conviction. The trial court sentenced him accordingly, ordering that the sentences run concurrently.

### III. EXCLUSION OF PUNISHMENT EVIDENCE

In four related points, Watrous complains of the trial court's refusal to allow defense counsel to ask Dr. Greer questions about the effect on Wesley if Watrous went to prison, Wesley's feelings about his father, and the benefits of ongoing counseling between Wesley and Watrous. Specifically, Watrous complains that the exclusion of Dr. Greer's relevant testimony offered pursuant to Texas Code of Criminal Procedure article 37.07 harmed him, that the exclusion violated his due process rights under the United States and Texas constitutions, and alternatively, that the trial court erred by denying him a hearing on his motion for new trial.

3

Dr. Greer testified that Watrous and Washburn were ordered to seek individual counseling services with Dr. Greer as part of their Child Protective Services (CPS) service plan after Ashley was killed. Dr. Greer testified to her belief that Watrous has taken responsibility and accountability for his actions on Christmas Eve 2009 and that he is remorseful. Watrous told Dr. Greer that he has "extreme self-hatred and extreme self-loathe" for causing his daughter's death, that he has stopped drinking alcohol, that he wants to talk to high school students about the dangers of alcohol and firearms, and that he wants to set up a scholarship foundation in Ashley's name. Dr. Greer testified that parenting is important to Watrous.

Dr. Greer also began counseling Wesley in January 2011. She saw him on one prior occasion in June 2010, when Washburn and Wesley showed up at her office. Wesley was challenging Washburn and did not understand why he could not see his dad and why "everybody hate[s] [his] dad." Dr. Greer testified that Wesley had lived with his father prior to Ashley's death and viewed his dad as more of the parenting figure and his mother "as more of an older sibling and not as a mother." According to Dr. Greer, at the time of trial, Wesley was suffering from bereavement and post traumatic stress disorder (PTSD). She explained that Wesley's PTSD had lessened significantly but that it had recurred when the trial started—"he's had a lot of difficulty with [the trial], and then the thoughts of what could happen to his dad and his dad's punishment." Dr. Greer testified that Wesley had nightmares and flashbacks, although the frequency of

4

both had decreased by the time of trial. Dr. Greer said that Wesley had suffered multiple losses—the death of his sister, the loss of his dad, the loss of his step-sister Emilie and step-brother Durendal, and the temporary loss of his mother when he could not live with her after Ashley's death. According to Dr. Greer, Wesley had suffered "ambiguous loss" regarding his father because Wesley could not have contact with Watrous but "desperately want[ed] to." Dr. Greer also said Wesley suffered ambiguous loss for his step-brother and step-sister. She testified, "[Wesley] has a lot of respect and admiration for his dad. He has positive thoughts about his dad."

Dr. Greer also supervised three therapeutic visitations between Wesley and Watrous the week before trial. She thought the visitations were necessary for Wesley to get some needed answers and have some closure. According to Dr. Greer, the visits went "extremely well," a weight seemed to have been lifted off Wesley's shoulders, he was not as restricted, he was happy to see his father, and he asked his dad a lot of questions about what had happened. Dr. Greer testified that Wesley's healing process was not complete and that she thought continued therapeutic supervised visitations between Watrous and Wesley were in Wesley's best interest. Dr. Greer also said that she believed Wesley and Washburn have been open with her from their first contact with her and have been sincere in their desires to heal. She also testified that she had no reason to doubt that the things Wesley had told her had actually taken place and that she believed he was sincere.

5

The trial court sustained the State's relevancy objections to the following questions propounded by defense counsel to Dr. Greer: (1) whether it was in Wesley's best interest to have ongoing supervised contact with his father, (2) whether Wesley told Dr. Greer that he loves Watrous and wants to see him, (3) whether Wesley had concerns about his father going to prison, (4) whether Dr. Greer believed that adults in Wesley's life pressured him into saying things to her, and (5) whether Wesley's mental health would be harmed if Watrous went to prison.

After both sides rested, defense counsel made a bill of exceptions, reciting the questions he wanted to ask Dr. Greer.[2] Specifically, defense counsel stated that he wanted to ask the following questions:

> First of all, do you believe ongoing supervised contact between Wesley and his dad is critical at this stage of his healing process?
> Has Wesley discussed with you the possibility of his dad going to prison for the shooting of his sister?
> Can you tell the jury what[] Wesley's feelings and desires are regarding his dad going to prison?
> Has Wesley discussed with you his desire to have ongoing contact with his dad?
> . . . .
> Is it your opinion that having ongoing contact with his dad is in Wesley's best interest?
> Does it matter whether that contact happens in your office or in prison?

---

[2]Defense counsel asked to make a bill of exceptions at the conclusion of Dr. Greer's testimony, but the trial court replied, "Let's do that later."

The State reiterated its objections that those questions requested irrelevant and improper opinion testimony, and the trial court reaffirmed its ruling. Watrous filed a motion for new trial, attaching as evidence the affidavit of Dr. Greer. In her affidavit, Dr. Greer set forth what her answers to those questions would have been:

> If asked at trial: Do you believe that on-going supervised contact between Wesley and his dad is critical at this stage of the healing process?
>
> My response would have been: Yes, I believe that ongoing contact between Wesley and his dad is critical at this stage of the healing process. Of particular concern for Wesley is the "Ambiguous Loss" of his father. The type of ambiguous loss applicable to Wesley described his father as physically absent due to the termination of his parental rights and court injunction prohibiting contact yet psychologically present. According to Walsh & McGoldrick (2004), the basic premise of ambiguous loss is that these situations are extremely stressful and confusing, thus immobilizing individuals and relational systems. The lack of clarity generates conflict, ambivalence, depression and anxiety. Long-term effects for individuals are depression, ambivalence, anxiety, guilt, often manifested by not being able to move on with one's life. Current literature and research supports the facilitation of the parent and child contact whenever possible. In regards to Wesley, he knows that his father could be physically present but for legal reasons is not able to be. This creates complicated grief and loss, which is extremely complex and difficult because the person is left in a state of perpetual grieving – where they get stuck in the grieving process. Having the contact with his dad may provide Wesley some of the critical closure he needs to continue the healing process.
>
> If asked at trial: Has Wesley discussed with you the possibility of his dad going to prison for the shooting of his sister?
>
> My response would have been: Yes, Wesley and I have had numerous conversations about the possibility of his dad going to prison for the shooting of his sister. Wesley is deeply concerned, distraught and distressed by this potential outcome. Wesley feels

7

the shooting was accidental, his father is sorry for what happened and that his father would never purposely or intentionally hurt him or any of his siblings.

If asked at trial: Can you tell the jury what Wesley's feelings and desires are regarding his dad going to prison?

My response would have been: Wesley does not want his dad to go to prison yet he wants his dad to have accountability for the shooting of his sister. Wesley has expressed a desire for his [d]ad to receive probation. Wesley feels the shooting was accidental and never would have happened if his dad was not drunk that night. Wesley holds his dad in high regard and believes his dad is remorseful. Wesley misses his dad terribly and continually expresses a desire to see his dad. He is worried that he will not be able to see his dad until he is an adult if he goes to prison. Wesley feels he needs his dad to be a part of his life.

If asked at trial: Has Wesley discussed with you his desire to have on-going contact with his dad?

My response would have been: Yes, Wesley has continuously asked for contact with his dad. Wesley has a tremendous amount [of] respect for and attachment to his dad. Wesley lived with [Watrous] from the age of four until December 24, 2009. Wesley is having difficulty understanding why he is unable to have contact with his dad and why he might be sent to prison because the dad that Wesley lived with every day is not the dad he experienced on December 24, 2009. Wesley has stated in numerous conversations with me that he is angry at the alcohol. He believes that his sister was accidentally shot due to his father being drunk that night. Wesley trusts and loves his dad and does not believe that he would ever purposely or intentionally harm himself or any of his siblings. Wesley has stated that he has never seen his father act in the manner he did that night of the shooting. His father had never had the firearms out as he did that night and he had never pointed the guns at himself or his sibling prior. I facilitated three supervised contacts with his [d]ad prior to the trial. The visits went extremely well and were beneficial for Wesley. Wesley has expressed a strong desire to continue contact with his dad. It is my professional opinion that ongoing contact with [Watrous] would be in Wesley's best interests.

8

If asked at trial: In your opinion, do you feel that Wesley is being pressured by the adults in his life into saying he wants to have contact with his dad?

My response would have been: No, Wesley has consistently asked for contact with his dad since December 24, 2009. Wesley has made this request to many adults and professionals including [h]is mother, Brandy Washburn, [u]ncles, CASA, CPS, Dan Hoffman (Attorney), his prior therapist (as documented in her clinical record), and myself. It is my professional opinion that Wesley's requests to have contact with his father are self-initiated and not the result of any pressure or duress from any adults in his life.

If asked at trial: Is it your opinion that having on-going contact with his dad is in Wesley's best interest?

My response would have been: Yes. Wesley has suffered multiple losses since the shooting, including the death of his sister, the loss of his two half siblings, temporary loss of his mother and the loss of his father. Any of these traumatic losses would be devastating alone. The idea that Wesley has had to navigate and process all these losses simultaneously is catastrophic. As I discussed earlier, Wesley is suffering from complicated grief and loss issues resulting from his ambiguous loss of his dad. The loss of his dad and half siblings has the capacity for reconciliation and an ongoing relationship. Providing Wesley reconnection with his dad could benefit his emotional, physical and psychological health and stability. Current research discusses the potential ensuing psychological insults that may result from cutting children off from a family member. It is not beneficial to the child's emotional development and maturity when ongoing contact can be safely facilitated. There is no reason that ongoing contact between Wesley and his dad would not be safe and appropriate. []

If asked at trial: Does it matter whether that contact happens in your office or in prison?

My response would have been: The best case scenario would be for Wesley and [Watrous] to have contact in my office to allow therapeutic visitation and to help facilitate appropriate ongoing contact. If the contact happens in prison there would not be a therapeutic component. Although, Wesley has expressed a desire to see his dad in any venue, I am concerned that having contact with

9

his father in prison could be emotionally and psychologically traumatic.

We need not decide whether the trial court's rulings, sustaining the State's objections to the proposed questions of defense counsel, were erroneous because, even assuming error, we hold that Watrous was not harmed by the rulings. Because any error in excluding this evidence was not constitutional, rule 44.2(b) applies.[3] Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v.*

---

[3]Watrous argues that the alleged errors were constitutional in nature because they effectively precluded him from presenting his defense. *See* Tex. R. App. P. 44.2(a); *Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007). The erroneous exclusion of evidence offered under the rules of evidence generally is not constitutional error and is reviewed under rule 44.2(b). *Walters*, 247 S.W.3d at 219. However, when erroneously excluded evidence offered by the criminal defendant "'forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense,'" the exclusion of evidence might rise to a constitutional violation. *Id.* (quoting *Wiley v. State*, 74 S.W.3d 399, 406–07 (Tex. Crim. App.), *cert. denied*, 537 U.S. 949 (2002)); *cf. Tiede v. State*, 76 S.W.3d 13, 14 (Tex. Crim. App. 2002) (remanding to court of appeals for determination of whether exclusion of defense's punishment evidence effectively precluded him from presenting a defense). Here, Watrous was not precluded from presenting a defense at his trial on punishment; in fact, as we set forth above and explain below, the jury heard much of the "excluded" testimony during Dr. Greer's testimony. Consequently, rule 44.2(b) applies.

*State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Id.* at 355–56.

A review of the entire six volumes of the record from the trial on punishment reveals that much of the excluded testimony from Dr. Greer was presented elsewhere in her testimony or through other witnesses and was thus cumulative. *See Mosley v. State*, 983 S.W.2d 249, 258 (Tex. Crim. App. 1998) (op. on reh'g) (explaining that the harm from the erroneous exclusion of evidence may be mitigated by the admission of evidence similar to what the appellant wished to offer), *cert. denied*, 526 U.S. 1070 (1999); *Anderson v. State*, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986) (holding that to show harm, the excluded evidence must be controlling on a material issue and not cumulative of other evidence); *Womble v. State*, 618 S.W.2d 59, 62 (Tex. Crim. App. [Panel Op.] 1981). Dr. Greer discussed in front of the jury Wesley's "ambiguous loss" of his dad and other family members, Wesley's concern over his dad going to

11

prison, Wesley's desire and need to see his father, and the benefits to Wesley from the three therapeutic visitations with his father. Dr. Greer testified that continued therapeutic supervised visitations were in Wesley's best interest. Although she was unable to testify directly to whether she believed Wesley had been pressured by the adults in his life into saying he wants to have contact with his dad, Dr. Greer said that she believed Wesley had been open and sincere with her, that she had no reason to doubt the things Wesley had told her, and that Wesley wants to see his father.

In addition to testimony by Dr. Greer directly related to the questions defense counsel was not allowed to ask her, numerous other witnesses testified about the relationship Watrous had with his children and his parenting abilities. Joann Oliver, a board certified clinical social worker and therapist, testified about her court-appointed social study of the Watrous family based on an allegation that Watrous had slapped Durendal. Oliver testified that parenting was a high priority for Watrous and that the children appeared happy with him.

In the months leading up to Ashley's death, Watrous was involved in a contentious custody dispute with Freeman over the custody of Durendal and Emilie. Dr. Linda Richardson testified that she had conducted a social investigation of the Watrous family as part of the custody dispute; Dr. Richardson testified that the children were happy around Watrous during the investigation and that she had recommended that Watrous be the primary caregiver of Durendal and Emilie. Kristi Compton, a licensed clinical psychologist, testified

12

that she had conducted a psychological evaluation of Watrous during custody evaluations in the fall of 2009, prior to Ashley's death. Compton testified that she believed Watrous loved his children and they loved him. Judy Aaron, a deputy sheriff in Denton County who had supervised visits between Watrous and his children from March 2009 through July 2009 also testified that the children all loved Watrous and that he loved them. She testified that Watrous had always planned out the visits with scheduled activities, that Watrous was firm but appropriate with the children, that the children always seemed happy, and that Aaron believed Watrous's "only priority" was parenting.

Watrous's brother Delorean Watrous testified that Wesley and Amber had lived with him and his other brother Desmond for three and a half months during the CPS investigation after Ashley's death. Delorean testified that Wesley had wanted to have contact with Watrous during that time and had constantly asked to see him, but that CPS had prohibited any contact during that time. Watrous's neighbor and friend, Brett Hartzell, testified that Watrous loved his children and his children loved him. Watrous testified that he does not deserve probation but that he is asking for probation so that he can continue to financially support his children. Watrous testified that although his parental rights to Wesley and Amber were terminated so that he had no financial obligation to support them, he has a moral obligation to do so.

During closing arguments, the State argued that Watrous is a good manipulator and that he is more focused on "self-preservation" instead of what is best for his children. The State argued,

> [Watrous] couldn't accept in the CPS case that Wesley's counselor who diagnosed him with post traumatic stress disorder from seeing his . . . sister shot in his presence, he couldn't accept that contact for Wesley wasn't best for Wesley because it's what he [Watrous] wanted, just like today, all about what he wants.
>
> So, when you decide the punishment, when you go back there and make that decision, take into consideration, has he really accepted full responsibility for what he's done?
>
> Has he moved beyond self-preservation? He hasn't. Take into consideration how this has affected Wesley. Dr. Greer told you that post traumatic stress disorder is cyclical. It's not linear. So, he might have improved today, but guess what, he might be back at the bottom of that slot.
>
> . . . . At any point in time he can regress. So he may have contact with his dad today or yesterday, but you know what, he might regress tomorrow and it may not be what's best for Wesley.

Watrous argues on appeal that the State was able to argue that he should go to prison "because it was the appropriate punishment for the impact [Watrous]'s crimes had on Wesley's life, and yet [Watrous] could not offer any response to this argument since evidence that would contradict the State's contention . . . had been kept from the jury." But we have already detailed the evidence presented to the jury that supports the defense's theory—in fact, Dr. Greer testified directly that Wesley's healing process was not complete and that continued therapeutic visitations with Watrous were in Wesley's best interest. Moreover, defense counsel was able to argue that probation was in Wesley's and

14

Watrous's other children's best interests. Defense counsel urged the jury to consider the "ripple effect" of Watrous's actions in considering his punishment and urged that he should receive probation:

> Consider Brandy [Washburn]. Consider Wesley in your determination. . . . What are the facts that have been established by the evidence with regard to Wesley? He's suffering PTSD, and he's made major strides because he's been able to have supervised therapeutic visitation with [Watrous.] When I asked Dr. Greer is the job complete, she said no. What is the reasonable inference from that? Those need to continue. They need to continue in her office.

Because Dr. Greer and other witnesses testified to substantially the same evidence that was excluded elsewhere and because our review of the record assures us that the exclusion of the complained-of testimony did not have a substantial or injurious effect or influence on the jury's assessment of punishment, assuming that the trial court's rulings were erroneous, any error was rendered harmless. *See* Tex. R. App. P. 44.2(b); *King*, 953 S.W.2d at 271; *Mosley*, 983 S.W.2d at 258; *Anderson*, 717 S.W.2d at 628; *Womble*, 618 S.W.2d at 62. We overrule Watrous's first point, complaining that the trial court's ruling harmed him.

## IV. CONCLUSION

Having overruled Watrous's first point, which is dispositive, we affirm the trial court's judgment. *See* Tex. R. App. P. 47.1.

SUE WALKER
JUSTICE

15

PANEL:  DAUPHINOT, GARDNER, and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  June 28, 2012