02-11-168--170-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

 


 
 
 Duke Watrous
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

FROM THE 16th
District Court OF Denton COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.  Introduction

          In
four related issues, Appellant Duke Watrous appeals the punishments
assessed after he pleaded guilty to manslaughter, endangering a child, and
tampering with physical evidence.  We will affirm.

II.  Factual
and Procedural Background

          On
Christmas Eve 2009, Watrous was at home with three of his five children: 
ten-year-old Ashley, nine-year-old Wesley, and one-year-old Amber.  Watrous,
who had been drinking alcohol, got a shotgun and began teaching Wesley and
Ashley how to defend themselves and disarm a “bad guy.”  Watrous pointed the
shotgun at Ashley, ran it along the side of her head, and poked her chest with
it.  He also pulled a handgun from the back of his waistband.  The handgun was
loaded and when he attempted to unload it, the gun fired, shooting Ashley in
the face.  Watrous picked up Ashley and put her on a table.  He said he was
cleaning his guns and told Wesley to call 911.  Watrous gathered his guns and
locked them in a safe in his bedroom closet.  Ashley died.

          At
the trial on punishment, the State introduced into evidence a DVD recording of
the events that occurred on Christmas Eve 2009 taken from a security camera in Watrous’s
home, the 911 call made by Wesley, photos of the crime scene, and the autopsy report.
 The State also presented as witnesses the police officers and EMT personnel who
had responded to the scene; Texas Ranger Tracey Murphree, who had conducted the
investigation; Brandy Washburn, who is the mother of Ashley, Wesley, and Amber;
and Aude Freeman, who is Watrous’s ex-wife and the mother of his other two
children, Durendal and Emilie.

Defense
counsel presented as witnesses Watrous himself; four of his brothers; a
neighbor; an employee of Watrous’s; a deputy sheriff who had supervised visits
between Watrous and his children as a result of a custody dispute between
Watrous and Freeman prior to Ashley’s death; a psychologist and a social worker
who had both conducted court-ordered social investigations as part of the
custody dispute; a psychologist who had conducted an evaluation of Watrous
after Ashley’s death; and Dr. Michelle Greer, a licensed professional counselor
who had counseled Watrous, Washburn, and Wesley after Ashley’s death.

          The
jury assessed Watrous’s punishment at twelve years’ confinement for the
manslaughter conviction, at two years’ confinement for the endangering a child
conviction, and at five years’ confinement for the tampering with physical
evidence conviction.  The trial court sentenced him accordingly, ordering that
the sentences run concurrently.

III.  Exclusion
of Punishment Evidence

          In
four related points, Watrous complains of the trial court’s refusal to allow
defense counsel to ask Dr. Greer questions about the effect on Wesley if
Watrous went to prison, Wesley’s feelings about his father, and the benefits of
ongoing counseling between Wesley and Watrous.  Specifically, Watrous complains
that the exclusion of Dr. Greer’s relevant testimony offered pursuant to Texas
Code of Criminal Procedure article 37.07 harmed him, that the exclusion
violated his due process rights under the United States and Texas
constitutions, and alternatively, that the trial court erred by denying him a
hearing on his motion for new trial.

Dr.
Greer testified that Watrous and Washburn were ordered to seek individual
counseling services with Dr. Greer as part of their Child Protective Services
(CPS) service plan after Ashley was killed.  Dr. Greer testified to her belief
that Watrous has taken responsibility and accountability for his actions on
Christmas Eve 2009 and that he is remorseful.  Watrous told Dr. Greer that he
has “extreme self-hatred and extreme self-loathe” for causing his daughter’s
death, that he has stopped drinking alcohol, that he wants to talk to high
school students about the dangers of alcohol and firearms, and that he wants to
set up a scholarship foundation in Ashley’s name.  Dr. Greer testified that
parenting is important to Watrous.

Dr.
Greer also began counseling Wesley in January 2011.  She saw him on one prior
occasion in June 2010, when Washburn and Wesley showed up at her office.  Wesley
was challenging Washburn and did not understand why he could not see his dad
and why “everybody hate[s] [his] dad.”  Dr. Greer testified that Wesley had
lived with his father prior to Ashley’s death and viewed his dad as more of the
parenting figure and his mother “as more of an older sibling and not as a
mother.”  According to Dr. Greer, at the time of trial, Wesley was suffering
from bereavement and post traumatic stress disorder (PTSD).  She explained that
Wesley’s PTSD had lessened significantly but that it had recurred when the
trial started—“he’s had a lot of difficulty with [the trial], and then the
thoughts of what could happen to his dad and his dad’s punishment.”  Dr. Greer
testified that Wesley had nightmares and flashbacks, although the frequency of both
had decreased by the time of trial.  Dr. Greer said that Wesley had suffered
multiple losses—the death of his sister, the loss of his dad, the loss of his
step-sister Emilie and step-brother Durendal, and the temporary loss of his
mother when he could not live with her after Ashley’s death.  According to Dr.
Greer, Wesley had suffered “ambiguous loss” regarding his father because Wesley
could not have contact with Watrous but “desperately want[ed] to.”  Dr. Greer
also said Wesley suffered ambiguous loss for his step-brother and step-sister.  She
testified, “[Wesley] has a lot of respect and admiration for his dad.  He has
positive thoughts about his dad.”

Dr.
Greer also supervised three therapeutic visitations between Wesley and Watrous
the week before trial.  She thought the visitations were necessary for Wesley
to get some needed answers and have some closure.  According to Dr. Greer, the
visits went “extremely well,” a weight seemed to have been lifted off Wesley’s shoulders,
he was not as restricted, he was happy to see his father, and he asked his dad
a lot of questions about what had happened.  Dr. Greer testified that Wesley’s
healing process was not complete and that she thought continued therapeutic
supervised visitations between Watrous and Wesley were in Wesley’s best
interest.  Dr. Greer also said that she believed Wesley and Washburn have been
open with her from their first contact with her and have been sincere in their
desires to heal.  She also testified that she had no reason to doubt that the
things Wesley had told her had actually taken place and that she believed he was
sincere.  

The
trial court sustained the State’s relevancy objections to the following questions
propounded by defense counsel to Dr. Greer: (1) whether it was in Wesley’s best
interest to have ongoing supervised contact with his father, (2) whether Wesley
told Dr. Greer that he loves Watrous and wants to see him, (3) whether Wesley
had concerns about his father going to prison, (4) whether Dr. Greer believed
that adults in Wesley’s life pressured him into saying things to her, and (5) whether
Wesley’s mental health would be harmed if Watrous went to prison.

After
both sides rested, defense counsel made a bill of exceptions, reciting the
questions he wanted to ask Dr. Greer.[2]  Specifically,
defense counsel stated that he wanted to ask the following questions:

First of all, do you
believe ongoing supervised contact between Wesley and his dad is critical at
this stage of his healing process?

Has Wesley discussed
with you the possibility of his dad going to prison for the shooting of his
sister?

Can you tell the jury
what[] Wesley’s feelings and desires are regarding his dad going to prison?

Has Wesley discussed
with you his desire to have ongoing contact with his dad?

. . . .

Is it your opinion
that having ongoing contact with his dad is in Wesley’s best interest?

Does
it matter whether that contact happens in your office or in prison?

The
State reiterated its objections that those questions requested irrelevant and
improper opinion testimony, and the trial court reaffirmed its ruling.  Watrous
filed a motion for new trial, attaching as evidence the affidavit of Dr. Greer.
 In her affidavit, Dr. Greer set forth what her answers to those questions
would have been:

If asked at trial: 
Do you believe that on-going supervised contact between Wesley and his dad is
critical at this stage of the healing process?

 

My response would
have been:  Yes, I believe that ongoing contact between Wesley and his dad is
critical at this stage of the healing process.  Of particular concern for
Wesley is the “Ambiguous Loss” of his father.  The type of ambiguous loss
applicable to Wesley described his father as physically absent due to the
termination of his parental rights and court injunction prohibiting contact yet
psychologically present.  According to Walsh & McGoldrick (2004), the basic
premise of ambiguous loss is that these situations are extremely stressful and
confusing, thus immobilizing individuals and relational systems.  The lack of
clarity generates conflict, ambivalence, depression and anxiety.  Long-term
effects for individuals are depression, ambivalence, anxiety, guilt, often
manifested by not being able to move on with one’s life.  Current literature
and research supports the facilitation of the parent and child contact whenever
possible.  In regards to Wesley, he knows that his father could be physically
present but for legal reasons is not able to be.  This creates complicated
grief and loss, which is extremely complex and difficult because the person is
left in a state of perpetual grieving – where they get stuck in the grieving
process.  Having the contact with his dad may provide Wesley some of the critical
closure he needs to continue the healing process.

 

If asked at trial:  Has
Wesley discussed with you the possibility of his dad going to prison for the
shooting of his sister?

 

My response would
have been:  Yes, Wesley and I have had numerous conversations about the
possibility of his dad going to prison for the shooting of his sister.  Wesley
is deeply concerned, distraught and distressed by this potential outcome. 
Wesley feels the shooting was accidental, his father is sorry for what happened
and that his father would never purposely or intentionally hurt him or any of
his siblings.

 

If asked at trial:  Can
you tell the jury what Wesley’s feelings and desires are regarding his dad
going to prison?

 

My response would
have been:  Wesley does not want his dad to go to prison yet he wants his dad
to have accountability for the shooting of his sister.  Wesley has expressed a
desire for his [d]ad to receive probation.  Wesley feels the shooting was
accidental and never would have happened if his dad was not drunk that night. 
Wesley holds his dad in high regard and believes his dad is remorseful.  Wesley
misses his dad terribly and continually expresses a desire to see his dad.  He
is worried that he will not be able to see his dad until he is an adult if he
goes to prison.  Wesley feels he needs his dad to be a part of his life.

 

If asked at trial:  Has
Wesley discussed with you his desire to have on-going contact with his dad?

 

My response would
have been:  Yes, Wesley has continuously asked for contact with his dad. 
Wesley has a tremendous amount [of] respect for and attachment to his dad. 
Wesley lived with [Watrous] from the age of four until December 24, 2009. 
Wesley is having difficulty understanding why he is unable to have contact with
his dad and why he might be sent to prison because the dad that Wesley lived
with every day is not the dad he experienced on December 24, 2009.  Wesley has
stated in numerous conversations with me that he is angry at the alcohol.  He
believes that his sister was accidentally shot due to his father being drunk
that night.  Wesley trusts and loves his dad and does not believe that he would
ever purposely or intentionally harm himself or any of his siblings.  Wesley
has stated that he has never seen his father act in the manner he did that
night of the shooting.  His father had never had the firearms out as he did
that night and he had never pointed the guns at himself or his sibling prior. 
I facilitated three supervised contacts with his [d]ad prior to the trial.  The
visits went extremely well and were beneficial for Wesley.  Wesley has
expressed a strong desire to continue contact with his dad.  It is my
professional opinion that ongoing contact with [Watrous] would be in Wesley’s
best interests.

 

If asked at trial: 
In your opinion, do you feel that Wesley is being pressured by the adults in
his life into saying he wants to have contact with his dad?

 

My response would
have been:  No, Wesley has consistently asked for contact with his dad since
December 24, 2009.  Wesley has made this request to many adults and
professionals including [h]is mother, Brandy Washburn, [u]ncles, CASA, CPS, Dan
Hoffman (Attorney), his prior therapist (as documented in her clinical record),
and myself.  It is my professional opinion that Wesley’s requests to have
contact with his father are self-initiated and not the result of any pressure
or duress from any adults in his life.

 

If asked at trial: 
Is it your opinion that having on-going contact with his dad is in Wesley’s
best interest?

 

My response would
have been:  Yes.  Wesley has suffered multiple losses since the shooting,
including the death of his sister, the loss of his two half siblings, temporary
loss of his mother and the loss of his father.  Any of these traumatic losses
would be devastating alone.  The idea that Wesley has had to navigate and
process all these losses simultaneously is catastrophic.  As I discussed
earlier, Wesley is suffering from complicated grief and loss issues resulting
from his ambiguous loss of his dad.  The loss of his dad and half siblings has
the capacity for reconciliation and an ongoing relationship.  Providing Wesley
reconnection with his dad could benefit his emotional, physical and
psychological health and stability.  Current research discusses the potential
ensuing psychological insults that may result from cutting children off from a
family member.  It is not beneficial to the child’s emotional development and
maturity when ongoing contact can be safely facilitated.  There is no reason
that ongoing contact between Wesley and his dad would not be safe and
appropriate. []

 

If asked at trial:  Does
it matter whether that contact happens in your office or in prison?

 

My response would
have been:  The best case scenario would be for Wesley and [Watrous] to have
contact in my office to allow therapeutic visitation and to help facilitate
appropriate ongoing contact.  If the contact happens in prison there would not
be a therapeutic component.  Although, Wesley has expressed a desire to see his
dad in any venue, I am concerned that having contact with his father in prison
could be emotionally and psychologically traumatic. 

We
need not decide whether the trial court’s rulings, sustaining the State’s
objections to the proposed questions of defense counsel, were erroneous
because, even assuming error, we hold that Watrous was not harmed by the
rulings.  Because any error in excluding this evidence was not constitutional,
rule 44.2(b) applies.[3] 
Tex. R. App. P. 44.2(b).  A substantial right is affected when the error had a
substantial and injurious effect or influence in determining the jury=s
verdict.  King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)
(citing Kotteakos v. United States, 328 U.S. 750, 776, 66 S. Ct. 1239,
1253 (1946)).  Conversely, an error does not affect a substantial right if we
have Afair
assurance that the error did not influence the jury, or had but a slight
effect.@  Solomon
v. State, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); Johnson v. State,
967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In
making this determination, we review the record as a whole, including any
testimony or physical evidence admitted for the jury=s
consideration, the nature of the evidence supporting the verdict, and the
character of the alleged error and how it might be considered in connection
with other evidence in the case.  Motilla v. State, 78 S.W.3d 352, 355
(Tex. Crim. App. 2002).  We may also consider the jury instructions, the State=s
theory and any defensive theories, whether the State emphasized the error,
closing arguments, and even voir dire, if applicable.  Id. at 355–56. 

A
review of the entire six volumes of the record from the trial on punishment
reveals that much of the excluded testimony from Dr. Greer was presented
elsewhere in her testimony or through other witnesses and was thus cumulative. 
See Mosley v. State, 983 S.W.2d 249, 258 (Tex. Crim. App. 1998) (op. on
reh’g) (explaining that the harm from the erroneous exclusion of evidence may
be mitigated by the admission of evidence similar to what the appellant wished
to offer), cert. denied, 526 U.S. 1070 (1999); Anderson v. State,
717 S.W.2d 622, 628 (Tex. Crim. App. 1986) (holding that to show harm, the
excluded evidence must be controlling on a material issue and not cumulative of
other evidence); Womble v. State, 618 S.W.2d 59, 62 (Tex. Crim. App. [Panel
Op.] 1981).  Dr. Greer discussed in front of the jury Wesley’s “ambiguous loss”
of his dad and other family members, Wesley’s concern over his dad going to
prison, Wesley’s desire and need to see his father, and the benefits to Wesley
from the three therapeutic visitations with his father.  Dr. Greer testified
that continued therapeutic supervised visitations were in Wesley’s best
interest.  Although she was unable to testify directly to whether she believed
Wesley had been pressured by the adults in his life into saying he wants to
have contact with his dad, Dr. Greer said that she believed Wesley had been
open and sincere with her, that she had no reason to doubt the things Wesley had
told her, and that Wesley wants to see his father.

In
addition to testimony by Dr. Greer directly related to the questions defense
counsel was not allowed to ask her, numerous other witnesses testified about
the relationship Watrous had with his children and his parenting abilities.  Joann
Oliver, a board certified clinical social worker and therapist, testified about
her court-appointed social study of the Watrous family based on an allegation
that Watrous had slapped Durendal.  Oliver testified that parenting was a high
priority for Watrous and that the children appeared happy with him.

In
the months leading up to Ashley’s death, Watrous was involved in a contentious
custody dispute with Freeman over the custody of Durendal and Emilie.  Dr.
Linda Richardson testified that she had conducted a social investigation of the
Watrous family as part of the custody dispute; Dr. Richardson testified that the
children were happy around Watrous during the investigation and that she had recommended
that Watrous be the primary caregiver of Durendal and Emilie.  Kristi Compton,
a licensed clinical psychologist, testified that she had conducted a
psychological evaluation of Watrous during custody evaluations in the fall of
2009, prior to Ashley’s death.  Compton testified that she believed Watrous
loved his children and they loved him.  Judy Aaron, a deputy sheriff in Denton
County who had supervised visits between Watrous and his children from March
2009 through July 2009 also testified that the children all loved Watrous and
that he loved them.  She testified that Watrous had always planned out the
visits with scheduled activities, that Watrous was firm but appropriate with
the children, that the children always seemed happy, and that Aaron believed
Watrous’s “only priority” was parenting.

Watrous’s
brother Delorean Watrous testified that Wesley and Amber had lived with him and
his other brother Desmond for three and a half months during the CPS
investigation after Ashley’s death.  Delorean testified that Wesley had wanted
to have contact with Watrous during that time and had constantly asked to see
him, but that CPS had prohibited any contact during that time.  Watrous’s
neighbor and friend, Brett Hartzell, testified that Watrous loved his children
and his children loved him.  Watrous testified that he does not deserve
probation but that he is asking for probation so that he can continue to financially
support his children.  Watrous testified that although his parental rights to
Wesley and Amber were terminated so that he had no financial obligation to
support them, he has a moral obligation to do so.

During
closing arguments, the State argued that Watrous is a good manipulator and that
he is more focused on “self-preservation” instead of what is best for his
children.  The State argued,

[Watrous] couldn’t
accept in the CPS case that Wesley’s counselor who diagnosed him with post
traumatic stress disorder from seeing his . . . sister shot in his presence, he
couldn’t accept that contact for Wesley wasn’t best for Wesley because it’s
what he [Watrous] wanted, just like today, all about what he wants.

 

So, when you decide
the punishment, when you go back there and make that decision, take into
consideration, has he really accepted full responsibility for what he’s done?

 

Has he moved beyond
self-preservation?  He hasn’t.  Take into consideration how this has affected
Wesley.  Dr. Greer told you that post traumatic stress disorder is cyclical. 
It’s not linear.  So, he might have improved today, but guess what, he might be
back at the bottom of that slot.

 

.
. . .  At any point in time he can regress.  So he may have contact with his
dad today or yesterday, but you know what, he might regress tomorrow and it may
not be what’s best for Wesley.

Watrous
argues on appeal that the State was able to argue that he should go to prison
“because it was the appropriate punishment for the impact [Watrous]’s crimes
had on Wesley’s life, and yet [Watrous] could not offer any response to this
argument since evidence that would contradict the State’s contention . . .  had
been kept from the jury.”  But we have already detailed the evidence presented
to the jury that supports the defense’s theory—in fact, Dr. Greer testified
directly that Wesley’s healing process was not complete and that continued
therapeutic visitations with Watrous were in Wesley’s best interest.  Moreover,
defense counsel was able to argue that probation was in Wesley’s and Watrous’s
other children’s best interests.  Defense counsel urged the jury to consider
the “ripple effect” of Watrous’s actions in considering his punishment and
urged that he should receive probation:

Consider Brandy
[Washburn].  Consider Wesley in your determination. . . .  What are the facts
that have been established by the evidence with regard to Wesley?  He’s
suffering PTSD, and he’s made major strides because he’s been able to have
supervised therapeutic visitation with [Watrous.]  When I asked Dr. Greer is
the job complete, she said no.  What is the reasonable inference from that? 
Those need to continue.  They need to continue in her office.

Because
Dr. Greer and other witnesses testified to substantially the same evidence that
was excluded elsewhere and because our review of the record assures us that the
exclusion of the complained-of testimony did not have a substantial or
injurious effect or influence on the jury’s assessment of punishment, assuming
that the trial court’s rulings were erroneous, any error was rendered
harmless.  See Tex. R. App. P. 44.2(b); King, 953 S.W.2d at 271; Mosley,
983 S.W.2d at 258; Anderson, 717 S.W.2d at 628; Womble, 618
S.W.2d at 62.  We overrule Watrous’s first point, complaining that the trial
court’s ruling harmed him.

IV.  Conclusion

          Having
overruled Watrous’s first point, which is dispositive, we affirm the trial
court’s judgment.  See Tex. R. App. P. 47.1.

 

 

SUE WALKER
JUSTICE

 

PANEL: 
DAUPHINOT,
GARDNER, and WALKER, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  June 28, 2012









[1]See Tex. R. App. P. 47.4.





[2]Defense counsel asked to
make a bill of exceptions at the conclusion of Dr. Greer’s testimony, but the
trial court replied, “Let’s do that later.”





[3]Watrous argues that the
alleged errors were constitutional in nature because they effectively precluded
him from presenting his defense.  See Tex. R. App. P. 44.2(a); Walters
v. State, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007).  The erroneous
exclusion of evidence offered under the rules of evidence generally is not constitutional
error and is reviewed under rule 44.2(b).  Walters, 247 S.W.3d at 219.  However,
when erroneously excluded evidence offered by the criminal defendant “‘forms
such a vital portion of the case that exclusion effectively precludes the
defendant from presenting a defense,’” the exclusion of evidence might rise to
a constitutional violation.  Id. (quoting Wiley v. State, 74
S.W.3d 399, 406–07 (Tex. Crim. App.), cert. denied, 537 U.S. 949
(2002)); cf. Tiede v. State, 76 S.W.3d 13, 14 (Tex. Crim. App. 2002) (remanding
to court of appeals for determination of whether exclusion of defense’s punishment
evidence effectively precluded him from presenting a defense).  Here,
Watrous was not precluded from presenting a defense at his trial on punishment;
in fact, as we set forth above and explain below, the jury heard much of the
“excluded” testimony during Dr. Greer’s testimony.  Consequently, rule 44.2(b)
applies.