# Court of Appeals
## Tenth Appellate District of Texas

---

### 10-24-00373-CR

---

Derek Joseph Daigneault,
Appellant

v.

The State of Texas,
Appellee

---

On appeal from the
19th District Court of McLennan County, Texas
Senior Judge Roy Sparkman, presiding
Trial Court Cause No. 2023-689-C1

---

JUSTICE HARRIS delivered the opinion of the Court.

### MEMORANDUM OPINION

Derek Joseph Daigneault was convicted of the murder of his cousin, Mandy Rose Reynolds, and sentenced to life in prison. We affirm the trial court's judgment.

**BACKGROUND**

Mandy's body was found burning in a residential development area in Robinson, Texas, in April of 2023. Daigneault quickly became a suspect. He called Robinson police on Mandy's cell phone—impersonating Mandy, was seen

buying and loading into Mandy's car a container like the one found at the scene in which Mandy was burned, fled to Kansas and led Kansas police on a high speed chase in Mandy's car, had Mandy's handgun in his possession in the car, crashed the car, fled on foot, and was caught hiding in a grocery store.

In two issues, Daigneault contends the evidence is insufficient to support his conviction and the trial court abused its discretion in excluding alleged "alternate perpetrator" evidence.

## SUFFICIENCY OF THE EVIDENCE

The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

> When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017). This standard requires the appellate court to defer "to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. We may not re-weigh the evidence or substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). The court conducting a sufficiency review must not engage in a "divide and conquer" strategy but must consider the cumulative force of all the evidence. *Villa*, 514 S.W.3d at 232. Although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial. *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016) (*citing Jackson*, 443 U.S. at 319); *see also Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim.

App. 2007). We presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). This is because the jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13.

We measure whether the evidence presented at trial was sufficient to support a conviction by comparing it to "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*; *see also Daugherty v. State*, 387 S.W.3d 654, 665 (Tex. Crim. App. 2013). The "law as authorized by the indictment" includes the statutory elements of the offense and those elements as modified by the indictment. *Daugherty*, 387 S.W.3d at 665.

*Zuniga v. State*, 551 S.W.3d 729, 732-33 (Tex. Crim. App. 2018).

Daigneault complains the evidence was insufficient to support his conviction because there was no direct evidence that he was "solely and individually" responsible for intentionally causing Mandy's death by shooting her. He contends the circumstantial evidence connecting him to Mandy's murder was too speculative. We disagree with Daigneault.

In this case, the evidence supports the jury's verdict that Daigneault

was the person who murdered Mandy. Daigneault and Mandy were cousins. Mandy brought Daigneault from Kansas to San Marcos, Texas, to live with her because she did not want to live alone. Only Daigneault, Mandy, and Titan, Mandy's dog, lived in the apartment. She kept a handgun, a .380, one that her "Nana" gave her, in her apartment. Mandy considered taking Daigneault back to Kansas, however, after they had had an argument. In the days prior to her death, Mandy expressed fear of Daigneault to her father.

Robinson police responded to a reported brush fire shortly after 10:00 p.m. on April 5, 2023 in a residential development area that was still under construction. The fire was actually a burning corpse later identified as Mandy Rose Reynolds. Mandy's dog, Titan, was observed running around at the scene of the fire. An urn containing the ashes of Mandy's grandmother, which Mandy always kept in her purse, was found in the debris from the fire along with metal curtain rings,[1] the remains of a plastic and metal container, a container handle and clasp, and a shell casing from a .380 handgun. A resident near the scene had seen the fire as early as 9:20 p.m. About 10 minutes before the fire was observed by the resident, a car resembling Mandy's black Honda Accord drove by two residences with Ring door cameras, appearing to be travelling in the

---

[1] These rings matched the rings of one curtain found in a Penske moving truck also containing most of the contents of Mandy's apartment. More of Mandy's possessions, along with empty bottles of cleaning products were found in a dumpster nearest to Mandy's apartment. Daigneault was seen loading items into the Penske truck and into Mandy's car.

direction of the crime scene.

Shortly after an email notification was sent to Mandy's email account stating that Robinson police had her dog, someone used Mandy's cell phone to contact the Robinson Police Department. The caller attempted to impersonate Mandy in an effort to recover the dog. The authorities knew the caller was not Mandy, but instead was a male. Moments after police questioned the male caller's claims, Mandy's Facebook page was deleted. The detective who took the phone call later recognized the male's voice as that of Daigneault.[2] Further, the detective had heard windshield wipers in the background during the first call, and a traffic camera image taken right before the phone call showed Mandy's car driving through heavy rain in San Marcos.

The day before Mandy's burned body was discovered, security video imaging from the parking lot showed that Daigneault drove Mandy's Honda to a Walmart in San Marcos and bought a large blue and black plastic container. The container had a handle and a clasp like the handle and clasp found at the scene of the fire. Daigneault also bought a shovel and a gas can. Also, through the security video, Daigneault was seen placing the container in the Honda. He had originally tried to fit the tote in the trunk of the Honda, but the container was too big for the trunk. In the video, Daigneault was seen wearing

---

[2] Diana, Mandy's friend, also identified the caller's voice as Daigneault.

a medical boot that he was known to be wearing. Titan, Mandy's dog, was also seen in the passenger seat of the car. Mandy was not seen anywhere in or around the vehicle. Mandy's Honda was then seen entering a parking lot at a Lowe's down the interstate from Walmart. Daigneault exited the Honda and entered Lowe's where he purchased a Lowe's bucket, Gorilla Tape, and what appeared to be paper towels. Afterward, he entered the Honda and exited the parking lot. Through cell phone records, Mandy's cell phone was shown to be in the immediate vicinity of the stores from where Daigneault was seen purchasing the container and other items. Cell phone records also showed that Mandy's cell phone travelled north on I-35 toward Robinson and was in the area of the fire at the time her body was burned.

Shortly after the discovery of Mandy's body, Daigneault fled to Kansas in Mandy's Honda. In Hillsboro, Texas, the location data for Mandy's cell phone ceased. A receipt ultimately found in the Honda showed that Daigneault used his incarcerated brother's identity to purchase a new phone in Hillsboro. When confronted by police in Wichita, Kansas, Daigneault fled in the Honda, resulting in a high-speed chase. Daigneault crashed the Honda and continued to flee on foot into a grocery store. Daigneault hid from police by crawling behind items on a shelf but was soon apprehended. Mandy's .380 handgun,[3]

---

[3] Diana identified the handgun found in Mandy's car as belonging to Mandy.

loose .380 ammunition, the gas can Daigneault bought at Walmart, and the cap Daigneault was seen wearing at Walmart and Lowe's were found in the Honda.

An autopsy of Mandy revealed that she had been shot in the head and killed with a .380 handgun before she was burned. A .380 bullet was located in her neck. The bullet recovered in the autopsy and the shell casing found at the fire were matched to the .380 handgun found in the Honda after Daigneault crashed it. Mandy had already begun decomposing before she was burned.

Although there may have been no eyewitness to Mandy's murder, other than Daigneault, the State may prove a defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009). Further, as previously noted, circumstantial evidence is as equally probative as direct evidence, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Zuniga v. State*, 551 S.W.3d 729, 732-33 (Tex. Crim. App. 2018). The Texas Rules of Evidence do not distinguish between direct and circumstantial evidence. Accordingly, circumstantial evidence is not second-class evidence. Furthermore, circumstances do not lie, but people do. Therefore, after viewing the evidence in the light most favorable to the verdict

and based on the cumulative force of all the incriminating evidence, we conclude that any rational trier of fact could have found that Daigneault shot and killed Mandy and then burned her body in Robinson, Texas. The circumstantial evidence in support of the verdict was not speculative.

Daigneault's first issue is overruled.

## EXCLUDED EVIDENCE

In his second issue, Daigneault contends the trial court abused its discretion in excluding his evidence proffered in two bills of review which he argues supported his alternate perpetrator theory. On appeal, Daigneault asserts that he sought to introduce Mandy's financial circumstances when she maintained no employment, suggesting she was a drug dealer or part of a cartel; other reasons why she was recently fearful unrelated to Daigneault; and two extraneous bad acts: an alleged $3,000 theft from an ex-boyfriend and possible theft or attempted theft of a firearm from another boyfriend.

We review a trial court's decision to admit or exclude evidence under an abuse-of-discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). "The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement." *Id*.

In the first bill of review, Randy Reynolds, Mandy's father, testified to Mandy's living arrangements, financial status, and drug use. Mandy had lived in San Marcos for a month or so before she was murdered. Randy thought she

moved to San Marcos in a "U-Haul" that she rented. He did not know whose name the rental was in. He also did not know if she returned the moving truck to the rental company. Before moving to San Marcos, Mandy lived in Tennessee for a month or so with her boyfriend, Jared. Jared did not follow her to San Marcos. Prior to living in Tennessee, Mandy lived in Idaho. There, she had a long-time boyfriend, Kevin, but she moved to Tennessee to be with her best friend, Diana.

Randy did not know what kind of job Mandy had in San Marcos; he knew that she wanted to go to school. He did not send her money to live on, and she did not have a trust fund, as far as he knew. Mandy worked for her mother in Idaho shortly before she moved to Tennessee. Randy speculated that her boyfriends were paying her way. He thought Jared was still sending her money and another boyfriend, Jacob, might have sent her money too. He did not know where Jacob lived, and Mandy never told him she was afraid of Jared or Jacob, only Daigneault.

As to drug use, Randy knew Mandy smoked marijuana but, to his knowledge, she did not sell it or grow her own. He did not know how she paid for her drugs.

At the conclusion of this bill, Daigneault agreed that the testimony may not be admissible at that time, but he thought the nexus between the testimony and his alternate perpetrator theory was that Mandy's income was from

dealing drugs.

In a later bill, Diana, Mandy's best friend, testified about Mandy's potential bad acts and potential enemies. Diana verified that Mandy took money from Jacob's Cash App, but did not know how much money was taken. Diana gave the money back to Jacob, but not because she thought Jacob was going to go to the police about the incident. She did not recall telling a San Marcos detective that Mandy had made enemies lately, but she "probably" used the word "enemy" when talking to them about Jacob. Diana denied that Mandy left Jacob stranded in Kansas; rather, Mandy bought him a one-way flight ticket to California because they had had a fight.

Diana knew Mandy smoked marijuana and knew she had a "bunch of what looked like vape pens," but she was not sure what they were for. There were no guns in Mandy's apartment other than the one Mandy's "Nana" gave her. Diana had heard there were some issues when Mandy left Kevin in Idaho, but she did not know if Mandy took weapons and assault rifles from him. She knew, however, that Daigneault took money from Mandy and took her gun.

At the conclusion of this bill, Daigneault asserted the nexus for this testimony would be that Mandy had other enemies. When pressed if there was any nexus between a theft from "Jared"[4] that may have led to him being at the

---

[4] The trial court and counsel may have confused Jared with Jacob, as Jacob was the ex-boyfriend from whom Mandy had allegedly stolen $3,000 and who Mandy had allegedly stranded in Kansas.

scene of the offense and doing something to Mandy, Daigneault thought the nexus was "that during this time when that theft occurred is when she didn't feel safe anymore and that she had stranded him in Kansas." He acknowledged, however, that no evidence had been presented that Jared was in or around San Marcos or Robinson or Mandy at or around the time of the offense.

After listening to the proffered testimony and to arguments of counsel, the trial court excluded the evidence, concluding that the proposed evidence was irrelevant and speculative, that no nexus was established between the testimony and the alternate perpetrator theory, and that the probative value of the evidence was outweighed by the danger of unfair prejudice.[5] *See* TEX. R. EVID. 401 (defining relevant evidence), 402 (non-relevant evidence is inadmissible), and 403 (relevant evidence may be excluded if probative value is substantially outweighed by the danger of unfair prejudice).

When a defendant seeks to introduce evidence of an alternate perpetrator, he must establish a sufficient nexus between that person and the crime. *Wiley v. State*, 74 S.W.3d 399, 406 (Tex. Crim. App. 2002). In weighing probative value against Rule 403 counterfactors, courts must be sensitive to

---

[5] The trial court also sustained the State's hearsay objection, but because of our disposition of this issue, we need not discuss the trial court's ruling on this objection.

the special problems presented by alternate perpetrator evidence. Although a defendant has a right to attempt to establish his innocence by showing that someone else committed the crime, he still must show that his proffered evidence regarding the alleged alternative perpetrator is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the alleged alternate perpetrator. *Id.* It is not sufficient for a defendant to proffer "unsupported speculation" that another person may have committed the crime. *Id.* at 407 n. 23 (citing *United States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998), cert. denied, 526 U.S. 1007, 119 S. Ct. 1148, 143 L. Ed. 2d 215 (1999)).

The alternate perpetrator evidence contained in the record shows, at best, that Mandy smoked marijuana, possessed "a bunch" of vape pens, was unemployed, failed to return a Penske truck being paid for by a boyfriend named Jared, took an unknown amount of money from another boyfriend named Jacob, and possibly made an enemy of Jacob. Despite Daigneault's attempts to elicit evidence that Mandy dealt drugs, stole weapons from Kevin, and left Jacob stranded in Kansas, the actual testimony did not support those accusations. Further, no testimony was adduced that Mandy was afraid of Jared, Jacob, or Kevin or that any of them were in Texas around the time of

Mandy's murder.[6]

Daigneault did not provide a sufficient nexus between an alternate perpetrator and Mandy's murder. None of the evidence pointed to another particular individual as the responsible party. The proffered evidence amounted to no more than mere speculation that another person may have committed the crime. Thus, even if the evidence was relevant, its probative value was substantially outweighed by the danger of unfair prejudice. Accordingly, the trial court did not abuse its discretion in excluding the proffered evidence.

Daigneault's second issue is overruled.

**CONCLUSION**

Having overruled each of Daigneault's issues raised on appeal, we affirm the trial court's judgment.

LEE HARRIS
Justice

OPINION DELIVERED and FILED: April 9, 2026

Before Chief Justice Johnson,
      Justice Smith, and
      Justice Harris
Affirmed
Do Not Publish
CRPM



---

[6] On appeal, Daigneault did not point to any other evidence in the record supporting his alternate perpetrator theory besides what was included in the two bills of review.