**Opinion issued June 25, 2026**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-24-00359-CR

———————————

**REBBA CARYN STUART, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 412th Judicial District Court**
**Brazoria County, Texas**
**Trial Court Case No. 95748-CR**

---

## MEMORANDUM OPINION

A jury convicted Rebba Caryn Stuart of injury to an elderly individual and sentenced her to thirty years' confinement. *See* TEX. PENAL CODE § 22.04. On appeal, Stuart contends the trial court erred by admitting certain evidence, denying her the opportunity to make offers of proof on excluded evidence, depriving her of

her constitutional right to present a complete defense, and ordering her to repay attorney's fees and other costs. We modify the trial court's judgment to strike the repayment of some fees and costs and affirm the judgment as modified.

## Background

On March 21, 2022, Stuart drove southbound into an intersection through a red light. At the same time, Florida Brown was passing eastbound through the intersection on a green light and had the right of way. The two cars collided. Brown was severely injured in the collision and later died.

A grand jury indicted Stuart for injury to elderly by causing her vehicle to strike Brown's vehicle. At trial, the State presented evidence that Stuart was driving sixty miles per hour and never tried to slow down or stop before the collision. A mechanical inspection of Stuart's car showed no pre-collision problems with the steering, brakes, or tires, and that the car was "controllable" and in "good shape." The State's mechanical expert testified that Stuart should have been able to "stop, stay, and steer." When Deputy McReynolds, a first responder at the crash scene, asked Stuart what happened, Stuart told McReynolds she was trying to kill herself.

Stuart was taken to the hospital and evaluated by a psychiatric nurse practitioner. The nurse practitioner testified that Stuart was "alert," "oriented," "calm," "cooperative," and "clear of thought" during the evaluation. Stuart claimed to have no intention of harming anyone but was evasive on questions about harming

herself. Stuart deflected some of those questions but ultimately acknowledged having suicidal thoughts. The nurse practitioner's report recited that Stuart "revealed to the primary team that the collision was intentional."

Stuart also self-reported a history of depression, Post-Traumatic Stress Disorder, and Borderline Personality Disorder. She told the nurse practitioner, "I had a very rough life and sometimes I don't want to be in it." She disclosed that her suicidal thoughts began at age seven, when she tried to "contract with her brother" to kill her. And she told the nurse practitioner that, about two months before the collision, she had been raped by her ex-boyfriend, leading her to terminate the resulting pregnancy and end the relationship.

The nurse practitioner spoke with Stuart's family, who expressed their belief that these events had affected Stuart's mental and emotional health. Stuart could not sleep, cried frequently, and was verbally (but not physically) aggressive. They also told the nurse practitioner that Stuart's alcohol consumption had increased, which conflicted with Stuart's statement that she had not been drinking alcohol.

Stuart was involuntarily discharged to a psychiatric hospital for treatment. She was involuntarily committed for inpatient psychiatric care a second time in April 2022.

Stuart's defense at trial included testimony from three witnesses: a psychologist, a paramedic who responded to the collision, and an accident

3

reconstructionist. The psychologist opined that Stuart did not have a diagnosable mental-health disorder. The paramedic testified that Stuart may have injured her head in the collision, was not making sense after the collision, and was in shock or an altered state. The accident reconstructionist testified, among other things, that Stuart did not have time to react to avoid the collision.

The jury ultimately found Stuart guilty and assessed her punishment at thirty years' confinement and a $10,000 fine. Although it found Stuart was indigent, the trial court also ordered Stuart to pay a $250 reimbursement fee and her attorney's fees.

**Admission of Evidence**

We begin with Stuart's first and third issues challenging the trial court's decision to admit into evidence (1) the data obtained from her car along with the associated testimony and report generated from the data and (2) a series of Facebook posts.

**A.    Car data**

Stuart argues the trial court should not have admitted data obtained from her car's event data recorder, testimony about the data, or the report generated from that data because the record does not show the State obtained the evidence with a valid

4

search warrant based on probable cause.[1]  *See* TEX. CODE CRIM. PROC. art. 38.23(a) ("No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused . . . ."). This issue is not preserved for our review.

After Stuart objected that the State had not shown it legally searched her car and seized data, the State offered the search warrant into the evidence. The warrant authorized officers to inspect Stuart's car for "vehicle functionality" by, among other things, examining the "airbag/electronic control module . . . that may record certain data," including the "speed [her] vehicle was traveling," "engine cycle revolutions," "engine throttle pressure," "braking information," and any "change in velocity." The warrant expressly stated that an affidavit from a licensed peace officer was attached and that the verified facts stated in the affidavit showed probable cause for the warrant's issuance. The State exhibited and offered the probable-cause affidavit along with the warrant, but Stuart objected that the affidavit should be excluded.

---

[1]  To the extent Stuart's brief can be read as challenging the constitutionality of the search of and retrieval of data from Brown's car, Stuart lacks standing to make the challenge because she has not shown any reasonable expectation of privacy in the contents of Brown's car. *See Kothe v. State*, 152 S.W.3d 54, 59 (Tex. Crim. App. 2004) ("Proof of a 'reasonable expectation of privacy' is at the forefront of all Fourth Amendment claims. Any defendant seeking to suppress evidence obtained in violation of the Fourth Amendment must first show that he personally had a reasonable expectation of privacy that the government invaded.").

According to Stuart, the affidavit contained hearsay, and its admission would violate her Fourth, Sixth, and Fourteenth Amendment rights because the State had not made the affiant available to testify. The trial court admitted the search warrant into evidence but excluded the probable-cause affidavit. The affidavit is not included in the appellate record.

Stuart argues that because the affidavit does not appear in the record, the State cannot establish the validity of the search warrant. This argument ignores Stuart's burden to preserve error.

It is the State's burden to justify a contested search. *See, e.g.*, *Miller v. State*, 736 S.W.2d 643, 648 (Tex. Crim. App. 1987). If the State relies on a search warrant, the State must "produce the warrant and its supporting affidavit for inspection of the trial court." *Moreno v. State*, 858 S.W.2d 453, 461 (Tex. Crim. App. 1993). But once the State produces the warrant and affidavit and they are "exhibited" to the trial court, as here, the defendant bears the responsibility to ensure that the warrant and affidavit are included in the record "if they are to be reviewed on appeal." *Id.*; *Miller*, 736 S.W.2d at 648; *see also Cannady v. State*, 582 S.W.2d 467, 469 (Tex. Crim. App. [Panel Op.] 1979). Because Stuart did not do so, she has not preserved this issue for our review. *See, e.g.*, *Washington v. State*, No. 14-23-00723-CR, 2025 WL 926468, at *4 (Tex. App.—Houston [14th Dist.] Mar. 27, 2025, no pet.) (mem. op., not designated for publication); *Boldon v. State*, No. 01-12-00486-CR, 2013 WL

6

5637031, at *7–8 (Tex. App.—Houston [1st Dist.] Oct. 15, 2013, pet. ref'd) (mem. op., not designated for publication).

We overrule Stuart's first issue.

## B.    Facebook posts

Stuart argues the trial court abused its discretion by admitting several Facebook posts because the State did not properly authenticate the posts under Texas Rule of Evidence 901.  Stuart objected that the State could not show the posts belonged to her through a sponsoring witness who had no personal knowledge of her or her Facebook account.  Assuming without deciding that the trial court abused its discretion by overruling Stuart's objection, we hold the error was harmless.

An erroneous evidentiary ruling is non-constitutional error.  *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018).  Non-constitutional error must be reversed only if it affects the defendant's substantial rights.  *See* TEX. R. APP. P. 44.2(b).  Substantial rights are not affected if an appellate court, after examining the record, has fair assurance that the error did not influence the jury or had only a slight effect.  *Gonzalez*, 544 S.W.3d at 373.  The reviewing court considers the entire record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how the alleged error might be considered in connection with other evidence in the case.  *Motilla v. State*, 78 S.W.3d 352, 357–58 (Tex. Crim. App.

7

2002). The court may also consider the jury charge, the State's theory and any defensive theories, closing arguments, and voir dire, if material to the defendant's claims. *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000).

Having considered the entire record, we cannot conclude the alleged error in admitting the Facebook posts had a substantial and injurious effect on the jury's verdict. The State offered the Facebook posts to support its theory that Stuart intended to crash her car because she was suicidal when she drove through the red light. The admitted exhibit contained five posts, made between March 12, 2022, and June 17, 2022, by an account using Stuart's name and likeness. The posts shared general or motivational statements about self-worth and mental health from other Facebook accounts, including:

- "There is no self[-]development without self-awareness. You can read as many books as you like, but if you're unable to read yourself you'll never learn a thing."

- "[T]here will always be someone who can't see your worth. [D]on't let it be you."

- "Loving yourself isn't vanity, it's sanity. The storms of life don't seem too bad when you have people around you that can support you. Find a licensed therapist . . . ."

- "Stop replaying the past in your mind. It's gone. Use your mental energy to manifest something new. Don't waste your precious life force being stuck on what didn't work out or what you could've done. Do something new today. Each moment is another chance to recreate yourself."

- "[S]top wondering if they care about you[.] [I]f you have to ask the answer is no[.]"

To the extent these Facebook posts were, as the State asserted, evidence of Stuart's poor mental health or suicidal ideation, it is weak evidence that would have slight influence on the jury. The posts were cumulative of other stronger evidence of Stuart's mental state, including Deputy McReynolds's testimony that Stuart told him after the collision that she was trying to kill herself, the nurse practitioner's testimony that Stuart acknowledged a history of suicidal thoughts and experienced trauma only two months before the collision, and various other testimony and exhibits showing Stuart's involuntary commitments for mental-health treatment in the months surrounding the collision. *See Lee v. State*, 418 S.W.3d 892, 900 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (holding cumulative evidence harmless). Thus, any error in admitting the Facebook posts was harmless. *See Mayes v. State*, 816 S.W.2d 79, 88 (Tex. Crim. App. 1991).

We overrule Stuart's third issue.

### Denial of Offer of Proof

Stuart asserts she was improperly denied the opportunity to make offers of proof concerning the credibility and truthfulness of the investigating officers, including the probable-cause affiant for the search warrant for Stuart's car. *See* TEX. R. EVID. 103(a)(2) ("[I]f the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the

9

context."), (c) ("In a jury trial, the court must allow a party to make the offer outside the jury's presence and before the court reads its charge to the jury.").

Stuart points to defense counsel's effort to introduce evidence that two officers involved in investigating Brown's death, including the probable-cause affiant, were the subject of an internal administrative investigation related to their compliance with the Brazoria County Sheriff's policies for handling evidence. Defense counsel alleged the prosecutor's office knew of the investigation before trial but only disclosed it during trial, potentially violating *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (establishing that prosecutors must disclose exculpatory evidence). To obtain information about the investigation, defense counsel served subpoenas for documents related to the investigation and for the Sheriff and the District Attorney to testify. On the State's motion, however, the trial court quashed the subpoenas, granted a protective order, and refused to let defense counsel make an offer of proof on what notice the District Attorney's office had of the administrative investigation through question and answer with the Sheriff or the defense's own investigator who had talked with the Sheriff about the matter.[2]

The right to make an offer of proof is absolute; a trial court lacks discretion to deny such a request. *See Kipp v. State*, 876 S.W.2d 330, 333 (Tex. Crim. App. 1994);

---

[2] The State argued, among other things, that the discovery requests were too broad and that the conversations between the Sheriff and the District Attorney were privileged and confidential.

*Spence v. State*, 758 S.W.2d 597, 599 (Tex. Crim. App. 1988). But the court's refusal to allow a defendant an opportunity to make an offer of proof is still subject to a non-constitutional harm analysis. *See Potier v. State*, 68 S.W.3d 657, 666 (Tex. Crim. App. 2002) (stating that standard of review under Rule 103 is same as standard for non-constitutional error); *see also* TEX. R. APP. P. 44.2(b) (non-constitutional errors "must be disregarded" if they do not affect the defendant's substantial rights).

Even assuming the trial court erred by refusing to let Stuart make an offer of proof through question and answer with either the Sheriff or the defense investigator, her substantial rights were not prejudiced because the substance of the evidence she wished to offer is apparent from the context. *See* TEX. R. EVID. 103(a)(2).

Soon after learning of the administrative investigation, defense counsel moved for a continuance and mistrial to gather additional information.[3] In considering the motion, the trial court heard testimony outside the jury's presence from another officer—a lieutenant of "professional standards" who was familiar with the investigation's existence but was not conducting the investigation himself. He explained that the administrative investigation began after the Sheriff's Office had trouble locating some information requested in a public information request. According to the lieutenant, the investigation did not involve allegations of criminal

---

[3]    The trial court granted a continuance of one day.

11

conduct on the officers' part but a failure to comply with departmental policy.  The lieutenant testified that the Sheriff himself had notified the District Attorney that the two officers were being investigated within two or three days of the investigation beginning in late March or early April, only a few weeks before trial.

After the trial court quashed the subpoenas and granted the protective order, defense counsel put on the record the questions he wanted to ask the Sheriff:

> [M]y line of questioning with the Sheriff would be were you made aware of an investigation with [the two officers]? . . . [D]id you inform anybody about this investigation with the District Attorney's Office? Who?  And when?  I would not ask [the Sheriff] to go into the details of his investigation or his department's investigation into either [officer] as far as the Sheriff.

Defense counsel added that he wanted the record to reflect that the Sheriff, "in fact, did have that conversation with [the District Attorney]."  And as to his own investigator, counsel wanted to make a record of the conversation he and the investigator had with the Sheriff about the notice—specifically, that the Sheriff told the defense's investigator that "he did in fact notify [the District Attorney] that an investigation was ongoing" before trial started.

Through these exchanges, defense counsel identified whom he wished to ask, what he wished to ask, and why he wished to ask it.  The context provided by these exchanges, along with the State's filings and their attachments, make clear what

12

Stuart wanted to preserve for appeal.[4] *See* TEX. R. EVID. 103(a)(2); *see also Coleman v. State*, 966 S.W.2d 525, 528 (Tex. Crim. App. 1998) ("A defendant who has not had an opportunity to interview a witness may make the necessary showing by establishing the matters to which the witness might testify and the relevance and importance of those matters to the success of the defense."). Consequently, Stuart's substantial rights were not prejudiced by the trial court's failure to permit a question-and-answer offer of proof with the Sheriff or defense investigator. *See, e.g.*, *Smith v. State*, No. 01-13-00438-CR, 2014 WL 4219556, at *3 (Tex. App.—Houston [1st Dist.] Aug. 26, 2014, pet. ref'd) (mem. op., not designated for publication) (trial court's refusal to allow defendant's offer of proof on excluded testimony was harmless because it was "apparent from the record what appellant was attempting to establish by introducing [the evidence]"); *Williams v. State*, 964 S.W.2d 747, 753 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) (same). There is no reversible error regarding the denial of offers of proof.

We overrule Stuart's second issue.

## Denial of Opportunity to Present Defense

Stuart next argues that the trial court's erroneous evidentiary rulings deprived her of the constitutional right to present a complete defense. Reading Stuart's brief

---

[4] The State's motions to quash and for protective orders included copies of the quashed subpoenas.

13

liberally, Stuart complains that the trial court should have admitted the probable-cause affidavit for the warrant to search her car, along with the warrant itself, because she challenged its "veracity." Because the State did not call the probable-cause affiant to testify, however, she was forced to object that the affidavit was hearsay and its admission would violate other constitutional rights. And because the affidavit was not admitted following her objection, she was denied her constitutional right to present a complete defense. *See Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009) (defendant's right to present complete defense is rooted in Fourteenth Amendment's due-process clause and Sixth Amendment's compulsory-process and confrontation clauses).

Erroneous evidentiary rulings rarely rise to the level of denying the constitutional right to present a complete defense. *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002). Relevant here, however, a constitutional violation may occur if the trial court's "clearly erroneous ruling excluding otherwise relevant, reliable evidence which 'forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense.'" *Id.* (quoting *Potier*, 68 S.W.3d at 665).

We cannot conclude that a constitutional violation occurred because we cannot conclude the trial court's evidentiary rulings were erroneous in the first place. *See id.* at 408. Stuart's argument ignores that the trial court excluded the probable-

14

cause affidavit only after she objected to its admission under the rule against hearsay and on other constitutional grounds, including the Sixth Amendment right to confront the witnesses against her. Even putting aside concerns that Stuart is making an appellate error of an action she induced,[5] we note her failure to ensure a copy of the affidavit appeared in the record precludes any determination of whether the affidavit was erroneously excluded. We cannot discern whether the affidavit contained inadmissible hearsay or testimonial statements that would trigger an opportunity to cross-examine the affiant. *Cf. Johnson v. State*, No. 01-22-00399-CR, 2023 WL 5760868, at *6 (Tex. App.—Houston [1st Dist.] Sept. 7, 2023, no pet.) (mem. op., not designated for publication) (recognizing general principle that even claims involving constitutional error must be preserved or they are waived); *Boldon*, 2013 WL 5637031, at *7–8 (discussing scenarios under which defendant has responsibility to ensure warrant and affidavit are included in record). Absent a showing of evidentiary error, there is no showing of constitutional error. *See Smith v. State*, 355 S.W.3d 138, 155 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (no constitutional violation occurred when trial court did not commit evidentiary error).

We overrule Stuart's fourth issue.

---

[5] *See Druery v. State*, 225 S.W.3d 491, 505–06 (Tex. Crim. App. 2007) ("[L]aw of invited error estops a party from making an appellate error of an action it induced.").

15

## Repayment of Fees

Stuart argues the trial court erred by ordering her to pay a $250 reimbursement fee and $15,042 in fees for her court-appointed attorney because the record contains no evidence that she had the ability to pay, as required by Article 26.05(g) of the Code of Criminal Procedure.

We review the assessment of court costs, including court-appointed attorney's fees, to determine whether a basis exists for the award. *See Johnson v. State*, 423 S.W.3d 385, 389–90 (Tex. Crim. App. 2014). An indigent defendant is entitled to have an attorney appointed to represent her in criminal proceedings at no cost. TEX. CODE CRIM. PROC. art. 1.051(c). Once the court determines that a defendant is indigent, the defendant is presumed to remain indigent for the rest of the proceedings. *Id.* art. 26.04(p); *Cates v. State*, 402 S.W.3d 250, 251–52 (Tex. Crim. App. 2013). A material change in the defendant's financial circumstances must occur to overcome this presumption. TEX. CODE CRIM. PROC. art. 26.04(p); *Cates*, 402 S.W.3d at 251–52. If the trial court later finds that the defendant has resources to pay the court-appointed attorney's fees, the court may order her to do so. TEX. CODE CRIM. PROC. art. 26.05(g).

The trial court found that Stuart was indigent and appointed counsel to represent her. The State concedes, and we agree, the record contains no evidence that would support a finding that Stuart could pay her attorney's fees. Accordingly,

we reform the judgment to strike the portion ordering Stuart to repay the fees for her court-appointed counsel.  TEX. CODE CRIM. PROC. art. 26.05(g); *Cates*, 402 S.W.3d at 251–52 (explaining that when there is no basis in record to support assessment of court-appointed attorney's fees, proper remedy is to reform judgment by striking fees).  The reimbursement fee will be struck for the same reason.  *See* TEX. CODE CRIM. PROC. art. 26.05(g).

We sustain Stuart's fifth issue.

## Conclusion

We reform the trial court's judgment to delete the assessment of $250 in reimbursement fees and $15,042 in attorney's fees.  The trial court's judgment is affirmed as modified.

Andrew Johnson
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.

Do not publish.  TEX. R. APP. P. 47.2(b).